FILED

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

2015 SEP 28 ₽ 4: 23

CLERK U.S. DISTRICT COURT
ALEXANDRIA VIRGINIA

| | |
|---|---|
| Krishna Prasad Adhikari, Biplav Bhatta, Lukendra Gurung, Sanjiv Gurung, Suraj Lamichhane,<br><br>Plaintiffs,<br><br>v.<br><br>KBR, Inc.; Kellogg Brown & Root LLC; Kellogg Brown & Root Services, Inc.; KBR Technical Services, Inc.; Kellogg Brown & Root Int'l, Inc.; Service Employees International Inc.; Overseas Administration Services; and John Does 1-5,<br><br>Defendants. | Case No. 1:15cv1248<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

The Plaintiffs, by, and through, their undersigned attorneys, bring this action on behalf of themselves against Defendants KBR, Inc.; Kellogg Brown & Root LLC; Kellogg Brown & Root Services, Inc.; KBR Technical Services, Inc.; Kellogg Brown & Root International, Inc.; Service Employees International Inc.; Overseas Administration Services; and John Does 1-5 ("Defendants") alleging as follows:

### I.   INTRODUCTION

1.     The Plaintiffs in this case are five Nepali men who were victims of trafficking in persons. The men were trafficked across international borders to provide menial labor at U.S. military facilities in Iraq for Defendant U.S. military contractors.

2.     Plaintiffs were lured from Nepal with false promises of good jobs in Amman, Jordan. Plaintiffs and/or their families went deep into debt to secure this employment, which they hoped would lift them and their families out of poverty. But after Plaintiffs arrived in

Jordan, their passports were taken from them and they were held against their will in a locked compound from which they were unable to escape. Eventually, Plaintiffs were transported against their will to U.S. military bases in Iraq, where they were forced to work for Defendant U.S. military contractors despite reporting to their supervisors that they had been tricked, had had their passports taken, and wanted to go home. Plaintiffs seek damages under, *inter alia*, the Trafficking Victims Protection Act, the Alien Tort Statute, and applicable state law.

## II.    JURISDICTION

3.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, as this action involves questions of federal law, and 18 U.S.C. § 1596, as this action involves alleged offenders who are nationals of the United States or present in the United States, irrespective of nationality. In addition, Plaintiffs were victims of violations of 18 U.S.C. §§ 1589 and 1590 and Defendants were subject to criminal prosecution for these violations pursuant to 18 U.S.C. §§ 3261 and 3271. Jurisdiction is also invoked pursuant to 28 U.S.C. § 1350, as this action involves a civil action by an alien for a tort in violation of the law of nations and treaties of the United States. The claims satisfy the "touch and concern" requirements described in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013). Supplemental jurisdiction over additional claims is conferred upon this Court by 28 U.S.C. § 1367(a), as these claims arise out of the same nucleus of facts which support the federal claims.

4.    Relevant conduct occurred on U.S. military bases under the exclusive jurisdiction and control of the United States and within the Special Maritime and Territorial Jurisdiction of the United States pursuant to 18 U.S.C. § 7(9).

5.    This Court has personal jurisdiction over the Defendants because each Defendant either is at home in Virginia, has systematic and continuous contacts with Virginia, transacts

business in Virginia, caused tortious injury by acts or omissions in Virginia, maintains an agent for service of process in Virginia, and/or was sufficiently and actually controlled by other Defendants such that it was merely the general or specific agent, or alter ego, of those Defendants.

6.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2), (b)(3) and (d).

## III.    PARTIES

Plaintiffs

7.      Biplav Bhatta is a citizen of Nepal. His wife was newly pregnant and he wanted to earn money to support his family. He saw an advertisement for well-paying jobs in Amman, Jordan.   Mr. Bhatta called the labor recruiter, who promised Mr. Bhatta a job as a chef at a luxury hotel in Jordan paying about US $600 per month. To secure the job, Mr. Bhatta was charged a large recruitment fee of 120,000 Nepalese rupees. His father took out a loan at 24% interest to help pay the fee. Mr. Bhatta's anticipated earnings were needed to repay the loan. Mr. Bhatta paid the rest of the fee with money he had saved from working as a cook. About a week later, Mr. Bhatta left Nepal for Jordan, as arranged by the labor recruiter.

8.      At the airport in Jordan, Mr. Bhatta was met by men affiliated with the labor recruiter. The men took his passport and drove him to a fenced compound. Once there, they locked him in. Mr. Bhatta saw that other Nepali men were being held at the compound as well. They were all housed together in two crowded, windowless rooms. The rooms were filthy and there was only one overflowing toilet. There was not enough food. Men would come to the compound to check on the Nepali men who were locked in. The Nepalis tried to question their captors, but the men told them to be quiet and threatened them. The captors mimed tearing up the men's passports and motioned with their hands, drawing their fingers across their throats, a

3

gesture Mr. Bhatta understood as threatening to kill them. Mr. Bhatta was unable to escape from the compound, as the fence was too high and the locked door was too sturdy. He was held in the compound for some time. Late one night, Mr. Bhatta and some of the other men were taken from the compound and loaded into vehicles. They were not told where they were going. They were driven for hours. When they arrived at their destination, Mr. Bhatta believed they were still in Jordan. He learned later he was at Camp Fallujah in Iraq. He was put to work on KBR's LOGCAP contract and was supervised by KBR supervisors and agents. From his first day at the base, Mr. Bhatta protested to both KBR and its agents that he was supposed to work in Jordan and that he had been brought to Iraq against his will. Mr. Bhatta spoke some English and thus was able to communicate with the supervisors. He asked that his passport be returned and that he be permitted to return home. In return, he was yelled at and told that he had been brought from Jordan to work. Mr. Bhatta was frightened and knew that he was trapped. Nonetheless, Mr. Bhatta told KBR employees almost every day that he and his friends had been promised jobs in Jordan and wanted their passports back. Despite repeated protests to Defendants that he had not agreed to work in Iraq, Mr. Bhatta was forced to work for Defendants against his will. He worked long hours, often seven days a week. He was permitted to return home after about 20 months at Fallujah, in or about early 2006. He did not receive his passport back until the day he left.

9.     Krishna Prasad Adhikari is a citizen of Nepal. Mr. Adhikari was also recruited to work in Jordan. A labor recruiter promised him a job working in a store or a hotel; he expected to earn about US $400 per month. To secure the job, he was charged a large recruitment fee. His father borrowed money to pay the recruitment fee. The family needed Mr. Adhikari's

anticipated earnings to repay the loan. When Mr. Adhikari left Nepal for Jordan, he was told by the labor recruiter that men would be waiting for him at the airport in Amman.

10.     As promised, at the airport in Jordan, Mr. Adhikari was met by men holding a sign. The men took his passport from him. They drove him to a compound surrounded by a very high wall and only one entrance. Once there, the men locked him in. There were other Nepali men locked in at the compound as well. Along with a few other men, he tried to open the door but it was locked from the outside. They pushed at it and tried to break the door, but the door was too large and too sturdy. The men were housed in two crowded, windowless rooms. The rooms were filthy and there was only one overflowing toilet. There was not enough food. Men would come to the compound to check on the Nepali men who were locked in. The men were threatening and intimidating. The Nepalis tried to question their captors, but the men told them to be quiet and mimed tearing up their passports. He was held in the compound for some time. Late one night, Mr. Adhikari and some of the other men were taken from the compound and loaded into vehicles. They were not told where they were going. They were driven for hours. When they arrived at their destination, Mr. Adhikari believed they were still in Jordan. He later learned he was at Camp Fallujah in Iraq. He was put to work on KBR's LOGCAP contract, and was supervised by KBR supervisors and agents. One of the employees at the base spoke Hindi, and Mr. Adhikari protested to that employee that he was supposed to work in Jordan and that he had been brought to Iraq against his will. He asked that he be permitted to return home. The employee translated his statements to a KBR supervisor. Other Nepali men protested as well. Despite repeated protests to Defendants that he had not agreed to work in Iraq, Mr. Adhikari was forced to work for Defendants against his will. He worked long hours, often seven days a week. He was permitted to return to Nepal in or about January 2007.

11.      Lukendra Gurung is a Nepali citizen.  He lived in a small village about 600 kilometers from Kathmandu.  He traveled to Kathmandu to find work.  He saw a newspaper advertisement for hotel jobs in Jordan.   In response to the advertisement, he went to the labor recruitment office, where the recruiter promised him a job as a cleaner at a hotel in Jordan paying about $400 monthly.  To secure the job, Mr. Gurung was charged a large recruitment fee.  His family sold livestock and borrowed money at 24% interest to pay the fee.  The family needed Mr. Gurung's anticipated earnings for support, to repay the loan, and to replace the livestock. The labor recruiter met Mr. Gurung at the Kathmandu airport and told him to look for men with a sign at the airport in Jordan.

12.      As promised, at the airport in Jordan, Mr. Gurung was met by men holding a sign. The men took his passport from him.  The men drove him to a compound surrounded by a high wall where he was locked in.  There were other Nepali men locked in at the compound as well. They looked severely neglected and Mr. Gurung became very frightened.  He tried to leave the compound, but the door was locked.  The men were housed in two overcrowded, windowless rooms.  The rooms were filthy and there was only one overflowing toilet.  The stench from the toilet was overpowering.  There was not enough food and not enough water.  Mr. Gurung was held in the compound for some time.  Late one night, Mr. Gurung and some of the other men were taken from the compound and loaded into vehicles.  They were not told where they were going, but assumed they were going to their worksite in Jordan.  They were driven for hours. Mr. Gurung was shocked to learn he had been taken to a U.S. military base in Iraq.  He was put to work on KBR's LOGCAP contract, and was supervised by KBR supervisors and agents.  Mr. Gurung asked Biplav Bhatta, a Nepali man who spoke some English, to tell the supervisors that he was supposed to be working in Jordan, not Iraq; that he had been brought to Iraq against his

will; and that he did not want to work in Iraq.  He asked that he be returned home.  Despite repeated protests to Defendants, Mr. Gurung was forced to work for Defendants against his will.  He worked long hours, often seven days a week.  In or about January 2007, his passport was returned to him and he returned to Nepal.

13.     Suraj Lamichhane is a citizen of Nepal.  After seeing a newspaper advertisement that offered well-paying jobs in Jordan, Mr. Lamichhane traveled to Kathmandu, where he met with a recruiter who promised him a job as an assistant store keeper in Jordan for about US $420 per month.  In order to secure the job, he paid a large recruitment fee.  Mr. Lamichhane and his wife took out a loan at 18% interest to pay the fee.  Mr. Lamichhane's family was counting on his new job to support his family and to pay off this large debt.  On his outgoing journey, Mr. Lamichhane met the labor recruiter at the Kathmandu airport and was instructed to look for men holding a sign at the airport in Jordan.

14.     As promised, at the airport in Jordan, Mr. Lamichhane was met by men holding a sign.  These men took his passport and then drove him to a compound surrounded by a high concrete wall.  He was locked in this compound with other Nepali men.  They were held in windowless rooms with only one bathroom to share.  Food was thrown to them over the wall of the compound, and there was never enough to go around.  When men came to the compound to check on them, the Nepali men tried to ask about the status of their jobs.  The men who came to the compound told the Nepalis to stop asking questions and threatened them.  Mr. Lamichhane understood that the men were threatening to tear up the Nepalis' passports and leave them to die.  Mr. Lamichhane was frightened.  He was held in the compound for some time.  Late one night, Mr. Lamichhane and some of the other men were taken from the compound and loaded into vehicles.  They were not told where they were going.  They were driven for hours.  When he

arrived at the worksite, Mr. Lamichhane met a man who introduced himself as Mr. Lamichhane's supervisor. The supervisor told him he would be working for KBR. The next day, Mr. Lamichhane learned he was in Iraq. He told several men, including his supervisor and a man with a KBR badge, that he was supposed to be working in Jordan, not Iraq; that he did not want to work in Iraq; and he had been brought to Iraq against his will. He asked for his passport back. The KBR employees said he could not leave and that his passport would not be returned. Eventually, one supervisor threatened to tear up his passport if he continued to ask to go home. Mr. Lamichhane was forced to work as a manual laborer despite his repeated protests. He worked long hours, often seven days a week. In or about October 2005, his passport was returned to him and he returned to Nepal.

15.     Sanjiv Gurung is a citizen of Nepal. He is from a small village in the Khotang region of Nepal. In the hopes of finding a job, Mr. Gurung traveled to Kathmandu. While there, he read an advertisement in the newspaper offering well-paying jobs in Jordan. He went to the labor recruiter's offices, where he met a recruiter who promised him a catering job in Jordan for a salary of about US $400 per month. In order to secure this job, Mr. Gurung had to pay a large recruitment fee. Mr. Gurung's family sold off some of their livestock and took out a loan at 24% interest in order to pay this fee. His family needed the salary from his new job in Jordan to pay off the loan and replace the livestock they had sold. The labor recruiter met Mr. Gurung at the airport in Kathmandu, gave him his ticket and told him to look for men holding a sign at the airport in Jordan.

16.     As promised, at the airport in Jordan, Mr. Gurung was met by men holding a sign. These men took Mr. Gurung's passport at the airport, and drove him to a compound surrounded by a high wall and a gate. Mr. Gurung was locked in once he arrived. There were already other

Nepali men in the compound. There was very little food or water. There was only one toilet that continually flooded, causing an unbearable stench. Several men came to the compound to check on the men, but when the Nepalis began to ask questions, they were told to be quiet. These men also threatened the Nepalis, miming tearing up their passports and drawing fingers over their throats, a gesture Mr. Gurung understood as a threat to kill them. Mr. Gurung was held in the compound for some time. Eventually, Mr. Gurung and some of the other men were herded into vehicles. Mr. Gurung did not know where they were going, but assumed he was finally headed to his new job in Jordan. When he arrived at the worksite, Mr. Gurung was shocked to learn he was at an American military base in Iraq. He was put to work on KBR's LOGCAP contract, and was supervised by KBR supervisors and agents. Mr. Gurung regularly told his supervisors that he wanted to go home and did not want to be in Iraq, but was repeatedly told he had to work and could not leave. Despite his many requests to leave, he was forced by the Defendants to work against his will. He worked long hours, often seven days a week. In or about early 2007, Mr. Gurung had his passport returned to him and he returned to Nepal.

Defendants

     17.    KBR was the U.S. Army's primary contractor for logistical support in Iraq. In 2001, the Army awarded KBR the LOGCAP III contract, the third generation of contracts under the Army's Logistics Civil Augmentation Program (LOGCAP). Under the LOGCAP III, KBR provided logistical support including transportation, dining services, facilities management, maintenance, and living accommodations for U.S. and coalition forces. The support services contracts required KBR to recruit and provide thousands of laborers to pick up trash, pump gas, serve meals, clean, do the laundry and perform other menial but necessary tasks.

18.     KBR collected in excess of $35 billion from the U.S. government pursuant to the LOGCAP III, taxpayer dollars that funded the conduct alleged herein.

19.     KBR administered and managed the LOGCAP III through its Government & Infrastructure business unit, which was headquartered in Arlington, Virginia, within the Eastern District of Virginia.  The LOGCAP III is administered by a U.S. military contracting office in Rock Island, Illinois, and KBR collected its $35 billion by submitting semi-monthly reports to that office in the United States.

20.     At all relevant times, the KBR Defendants operated as a "single team."  On information and belief, the KBR Defendants conducted tasks on behalf of one another, transacted business in the same offices, had overlapping officers and employees, had common business departments, and filed consolidated tax statements.  In addition, employees of the KBR Defendants frequently worked for and/or exercised authority on behalf of more than one KBR entity while generically identifying their employer as "KBR."  Lines between the closely integrated companies were often obscured, resulting in the projection of the image of a single company.

21.     Defendant KBR, INC. is a Delaware corporation with offices in this District at 2451 Crystal Drive, Arlington, VA 22202.  KBR, Inc. has been a defendant in litigation arising out of the LOGCAP III in the Eastern District of Virginia.  KBR, Inc. is the parent company of KBR Services and KBR Technical Services, Inc.  During the relevant time period, KBR, Inc. administered and managed LOGCAP III contracts.

22.     Defendant KBR LLC is a Delaware corporation with offices in this District at 2451 Crystal Drive, Arlington, VA 22202.  KBR LLC has an agent for service of process in in the Eastern District of Virginia, and has been a defendant in litigation arising out of the

LOGCAP III in the Eastern District of Virginia.  KBR LLC is the successor to Kellogg Brown and Root Inc.  Kellogg Brown & Root Inc. conducted operations in Iraq through its divisions KELLOGG BROWN & ROOT INTERNATIONAL, INC., and BROWN & ROOT SERVICES, INC., which also had offices in this District at 1611 Kent Street, Arlington, Virginia 22209. During the relevant time period, Kellogg Brown & Root Inc., directly and through its divisions, administered and managed LOGCAP III contracts.  Among other things, employees of Kellogg Brown & Root Inc. and its divisions supervised the contractual performance of KBR's labor brokers; imposed detailed standards and systems for KBR's labor brokers to use; supervised laborer policies and practices; received repeated complaints about improper labor practices by KBR's labor brokers, particularly Daoud (described below); and concealed wrongdoing by Daoud.

23.     Defendant KELLOGG BROWN & ROOT SERVICES INC. ("KBR Services") is a Delaware corporation and subsidiary of KBR, Inc.  KBR Services has offices in this District at 2451 Crystal Drive, Arlington, VA 22202, has an agent for service of process in the Eastern District of Virginia, and has been a defendant in litigation arising out of the LOGCAP III in the Eastern District of Virginia.  During the relevant time period, KBR Services administered and managed LOGCAP III contracts, including contracts with Daoud, through its Government & Infrastructure business unit, which was headquartered in Arlington, Virginia, within the Eastern District of Virginia.  Among other things, KBR Services established mandatory procedures and policies for all of its subcontractors.  KBR Services employees also supervised the contractual performance of KBR's labor brokers; imposed detailed standards and systems for KBR's labor brokers to use; supervised worker policies and practices; inspected compliance with KBR's standards by KBR's labor brokers; received repeated complaints about improper labor practices

and trafficking, particularly by Daoud; and provided information in response to media inquiries about trafficking to enable the abuses to continue.

24.     Defendant KBR Technical Services, Inc. ("KBR Technical Services") is a Delaware corporation that employs personnel at offices in this District, including offices at 2451 Crystal Drive, Arlington, VA 22202. KBR Technical Services also has an agent for service of process in the Eastern District of Virginia. On information and belief, during the relevant time period, KBR Technical Services employees administered and managed LOGCAP III contracts, including contracts with Daoud. Among other things, KBR Technical Services employees contracted with Daoud; supervised the contractual performance of KBR's labor brokers; received repeated reports of improper labor practices by KBR's labor brokers, particularly Daoud; managed KBR's response to press and governmental inquiries into human trafficking; and concealed wrongdoing by Daoud. KBR Technical Services is a subsidiary of KBR, Inc.

25.     Defendant Kellogg Brown & Root International, Inc. ("KBR International") is a Delaware corporation and subsidiary of KBR LLC. KBR International has been a defendant in litigation arising out of the LOGCAP III in the Eastern District of Virginia. KBR International administered and managed LOGCAP III contracts, including contracts with Daoud. Among other things, employees of KBR International contracted with Daoud; supervised the contractual performance of KBR's labor brokers; supervised worker policies and practices; received repeated complaints about improper labor practices by KBR's labor brokers, particularly Daoud; and concealed wrongdoing by Daoud. KBR International had at least one contract with Daoud & Partners during the relevant time period.

26.     Defendant Service Employees International, Inc. ("SEII") is a one hundred percent (100%) wholly owned KBR subsidiary. On information and belief, defendant SEII was

12

incorporated by KBR's managers in the Cayman Islands, but managed by other KBR Defendants from the United States. Other KBR Defendants named herein exercised sufficient actual control over SEII that the latter was merely the general or specific agent, or alter ego, of the former. SEII was involved in LOGCAP III operations, and has been a defendant in litigation arising out of the LOGCAP III in the Eastern District of Virginia. On information and belief, employees of SEII administered and managed LOGCAP III contracts, including contracts with Daoud. On information and belief, employees of SEII, *inter alia*, supervised the contractual performance of KBR's labor brokers; supervised worker policies and practices; and received repeated complaints about improper labor practices by KBR's labor brokers, particularly Daoud.

27.     Defendant Overseas Administration Services ("OAS") is a KBR subsidiary. Based on information and belief, defendant OAS was incorporated by KBR's managers in the Cayman Islands, but managed by other KBR Defendants from the United States. Other KBR Defendants named herein exercised sufficient actual control over OAS that the latter was merely a general or specific agent, or the alter ego, of the former. OAS was involved in LOGCAP operations. On information and belief, employees of OAS administered and managed LOGCAP III contracts, including contracts with Daoud. On information and belief, employees of OAS supervised the contractual performance of KBR's labor brokers; supervised worker policies and practices; and received repeated complaints about improper labor practices by KBR's labor brokers, particularly Daoud.

28.     At the present time, certain companies responsible for the violations of law detailed herein are unknown to Plaintiffs. Defendants John Does 1-5 are liable to the Plaintiffs for these violations of law.

29.     Defendants KBR, Inc; KBR LLC; KBR Services; KBR Technical Services; KBR International; SEII; OAS; and John Does 1-5 are referred to herein as the KBR Defendants or, simply, Defendants or KBR.

Other Parties in the Trafficking Chain Who Are Unnamed Agents and/or Participants in the Plan, Scheme, or Pattern to Obtain Third Country National Workers

30.     Defendants committed the wrongs alleged herein with a group or chain of agents and/or participants in the plan, scheme, or pattern to obtain third-country national workers for KBR's contracts with the U.S. military stretching from Iraq to Nepal, including Daoud & Partners; Moonlight Consultant Pvt., Ltd.; and Morning Star for Recruitment and Manpower Supply. These agents and/or participants in the plan, scheme or pattern to obtain third-country national workers constitute a transnational organized group or enterprise.

31.     Daoud & Partners was at all relevant times an agent of KBR and subcontractor on KBR's LOGCAP III contract with the United States military. Daoud is incorporated in the British Virgin Islands and provides services exclusively in Iraq. Daoud received 100% of its revenue from KBR. Daoud's actions, as detailed herein, were conducted on KBR's behalf and subject to KBR's control. At all relevant times, Daoud was an agent of KBR, which, as alleged in detail below, controlled the manner and means of Daoud's performance, including its recruitment and provision of laborers. KBR provided substantial support to Daoud with the purpose of facilitating Daoud's conduct.

32.     Moonlight Consultant Pvt., Ltd. (hereinafter "Moonlight") is a Nepali company. It recruited laborers and then transferred the laborers to Morning Star for Recruitment and Manpower Supply, as set forth in detail below.

33.     Morning Star for Recruitment and Manpower Supply (hereinafter "Morning Star") is a Jordanian job brokerage company that operates in Amman, Jordan.

14

34.     At all relevant times, various other persons, companies, and corporations, the identities of which are presently unknown, willingly acted with Defendants as part of the scheme, plan or pattern to obtain laborers for KBR's LOGCAP contract as set forth in detail below.  All averments herein against any named Defendant are also averred against these unnamed agents.

## IV.    FACTUAL ALLEGATIONS

### Trafficking in Persons

35.     Trafficking in human beings is a growing scourge around the world.  The United States government estimates that as many as 27 million men, women, and children are victims of human trafficking at any given time,[1] despite the efforts of the United States to improve enforcement of anti-trafficking statutes at home and abroad.

36.     Human traffickers prey on the most vulnerable members of society, including people living in poverty and persons unable to find work in their home countries.[2]  They typically trick, coerce, or win the confidence of their victims through promises of a better life.[3]  Victims are often lured with false promises of good jobs and better lives, only to find themselves trapped in brutal or dangerous conditions.[4]

37.     Trafficking is a transnational criminal enterprise, generating billions of dollars each year.[5]  Trafficking is the fastest-growing source of profits for organized criminal enterprises

---

[1] United States Department of State, Trafficking in Persons Report 7 (2013) [hereinafter "TIP 2013"].

[2] *Id.* at 8-9.

[3] *Id.* at 10, 24-25, 29.

[4] United States Department of Justice, Attorney General's Annual Report to Congress on U.S. Government Activities to Combat Trafficking in Persons Fiscal Year 2006 1(2007).

[5] United States Department of State, Trafficking in Persons Report 34 (2008) ("Recent estimates of this illegal global trade are as high as $32 billion . . . ."); United States Department

worldwide.[6] Some traffickers are individuals, but others are part of large criminal organizations that use the routes set up for trafficking in illicit items, such as guns or drugs, to traffic in human beings.

38.     In order to combat trafficking, the United States became a party to the United Nations' Protocol to Prevent, Suppress and Punish Trafficking in Persons, along with more than 150 other nations.  The Protocol requires State Parties to enact criminal penalties for human trafficking.  The Protocol further requires State Parties to ensure that their domestic legal systems provide victims of trafficking in persons the possibility of obtaining compensation for damages suffered.

39.     Congress enacted the Trafficking Victims Protection Act to combat the use of forced and bonded labor, and has reauthorized the Act multiple times, most recently in 2013. The Trafficking Victims Protection Act enhances criminal penalties for human trafficking and codifies civil remedies for victims.

Combatting human trafficking by government contractors is a longstanding goal of the U.S. Government

40.     Combating human trafficking by government contractors has been a longstanding goal of the U.S. Government.

41.     National Security Directive 22, issued on December 16, 2002, announced a zero tolerance policy against human trafficking by U.S. contractors and defined the crime of

---

of State, Trafficking in Persons Report 14 (2005) [hereinafter "TIP 2005"] ("According to the U.S. Federal Bureau of Investigation, human trafficking generates an estimated $9.5 billion in annual revenue").

[6] Victims of Trafficking and Violence Protection Act of 2000, H.R. 3244, 106th Cong. § 102(b)(8) (2000).

trafficking in persons as a global threat to national security.[7]  A series of Department of Defense directives implementing and expanding upon the order followed.

42.     A Memorandum from Paul Wolfowitz, Deputy Secretary of Defense, to Secretaries of the Military Departments, et al. (Jan. 30, 2004), stated that Trafficking in Persons by DoD contract personnel "undermines our peacekeeping efforts."  A Memorandum from Donald Rumsfeld, Secretary of Defense, to Secretaries of the Military Departments, et al. (Sept. 16, 2004), expressed concern about labor trafficking at overseas DoD locations and instructed commanders to use all available tools to combat trafficking.  In the State Department Trafficking in Persons Report, Secretary of State Condoleeza Rice stated that ending trafficking in persons is "a matter of global security" and a priority of the United States.[8]

43.     Congress found that "the involvement of employees and contractors of the United States Government and members of the Armed Forces in trafficking in persons, facilitating the trafficking in persons, or exploiting the victims of trafficking in persons is inconsistent with United States laws and policies and undermines the credibility and mission of United States Government programs."[9]  A Congressional leader of anti-trafficking efforts further stated that "contractor involvement in trafficking . . . weakens the rule of law, strengthens criminal networks, and undermines DOD's own mission" and that if contractors paid by U.S. taxpayer funds engage in actions that allow "human trafficking to prosper, the efforts of our president, the State Department and Congress to combat this criminal scourge are thwarted."

---

[7] The White House, National Security Presidential Directive/NSPD-22 (Dec. 16, 2002), http://www.combat-trafficking.army.mil/documents/policy/NSPD-22.pdf.

[8] See United States Department of State, Trafficking in Persons Report 1, 19 (2006).

[9] Trafficking Victims Protection Reauthorization Act of 2005, H.R. 972, 109th Cong. § 2(10) (2006).

44.     Similarly, the Commission on Wartime Contracting in Iraq and Afghanistan observed in its 2011 report that it had "uncovered tragic evidence of the recurrent problem of trafficking in persons" in contingency contracting and concluded that trafficking in persons by U.S. military contractors violated U.S. law and regulations, brought discredit to the United States, and acted as a barrier to building good diplomatic relations.

U.S. Military Bases in Iraq As A Destination For Trafficked Labor

45.     Iraq was a destination country for trafficked labor.[10]  The United States government has found that Iraq was a destination for men trafficked from South and Southeast Asia to work as construction workers and in other menial jobs:  "Some foreign migrants are recruited for work in other countries such as Jordan or the Gulf States, but are forced, coerced, or deceived into traveling to Iraq, where their passports are confiscated" and they are forced to work.[11]

46.     "Brokers and subcontractors from Asia to the Middle East have worked in concert to import thousands of laborers into Iraq from impoverished countries, often employing fraud or coercion along the way, seizing workers' passports and charging recruitment 'fees' that make it difficult for workers to escape employment in the war zone."[12]

47.     The United States reports that Jordan is a transit country for men from Southeast Asia trafficked for the purpose of labor exploitation, particularly for men "deceptively recruited with fraudulent job offers in Jordan instead trafficked to work involuntarily in Iraq."[13]

---

[10] TIP 2013 at 202.

[11] *Id.* at 202.

[12] Cam Simpson, *U.S. Tax Dollars Tied to Human Trafficking, Report Alleges*, Chicago Tribune, June 6, 2006 at 8.

[13] United States Department of State, Trafficking in Persons Report 126 (2007).

48.     In 2006, the top United States Commander in Iraq confirmed that contractors on American military bases had violated human-trafficking laws and committed other abuses, including deceptive hiring practices, excessive fees charged by overseas job brokers who lure workers into Iraq, and circumvention of Iraqi immigration procedures.  General Casey ordered that contractors be required to return passports that had been illegally confiscated from laborers on U.S. bases and to end other abuses.[14]

49.     A U.S. military contracting office in Rock Island, Illinois, added a clause to KBR's LOGCAP III contract explicitly to prohibit human trafficking and forced labor.  The clause defined trafficking and forced labor to include the conduct alleged herein.  The clause also required contractors to monitor their employees and subcontractors to prevent human trafficking and forced labor.  The clause made it a violation of the contract for any contractor to engage in human trafficking or use forced labor.  Despite the new clause, KBR continued to retain Daoud and use its services.

50.     The United States described these abuses as "indicative of trafficking in persons" in a report on the Department of Defense response to labor trafficking in Iraq.[15]

51.     In 2007, approximately 35,000 of the 48,000 people working under contract on American bases in Iraq were "third-country nationals," workers who were imported from outside Iraq and who were not United States citizens.

52.     Contractors brought the third-country nationals (TCNs) to Iraq from impoverished countries such as Nepal, the Philippines and Bangladesh to do menial jobs, from cooking and serving food to cleaning toilets and running the laundry.  The TCNs toiled long hours for low

---

[14] MNF-I FRAGO 06-188 [Trafficking in Persons] (2006), Order issued by General Casey.

[15] United States Department of State, Trafficking in Persons Report 19 (2006).

pay and endured living conditions that their home nations have called human rights violations. The TCNs often had to work for months simply to pay off the debts they or their families incurred to labor traffickers. Many had no idea that they would end up in a war zone.

53.     According to media reports, the TCNs worked long hours, up to twelve hours a day, with very few days off; were sometimes reduced to begging for needed medication; were not provided safety equipment; were not permitted to use the recreation facilities or access internet or telephone communications equipment; and shared cramped living quarters.

The Plaintiffs' Journey

54.     In 2004, Moonlight, a recruiting agency based in Kathmandu, Nepal, was contacted by Morning Star, a Jordanian company. Morning Star said it needed employees for hotel work in Jordan. Moonlight and Morning Star entered into an agreement whereby Moonlight would recruit and supply Nepali citizens for the jobs in Jordan for Morning Star.

55.     Moonlight placed advertisements in Nepali newspapers for jobs in Amman, Jordan. The advertisement was prepared by Morning Star.

56.     The advertisements called for cooks, kitchen helpers, room boys, cleaners, housekeeping supervisors, salad men, butchers, pastry men, store keepers, and a secretary, among others, and listed salaries for each job category. The advertisement stated that workers who had hotel experience would be given priority, lodging would be provided, and the contracts were for two years.

57.     Plaintiffs, including Plaintiffs Biplav Bhatta, Suraj Lamichhane, Lukendra Gurung and Sanjiv Gurung, saw the advertisements for hotel jobs in Amman, Jordan and went to the recruitment agency, Moonlight.

58.     Plaintiffs met with representatives of Moonlight.  Moonlight promised them well-paying jobs in Jordan.  Biplav Bhatta, for example, was studying to become a chef, and Moonlight promised him a job in Jordan as a chef earning about US $600 a month.  Lukendra Gurung was promised a job as a cleaner paying about US $400 a month.

59.     To secure the promised jobs, each Plaintiff was charged a high fee.  For example, Krishna Prasad Adhikari was charged a fee of 150,000 Nepalese rupees.  This fee was far more than Plaintiffs could earn in a year in Nepal.

60.     Plaintiffs and/or their family members took out loans to pay the recruitment fee.  Mr. Bhatta's and Mr. Adhikari's fathers took out loans, as did Mr. L. Gurung's and S. Gurung's families and Mr. Lamichhane's wife.  The Plaintiffs and their families were charged interest rates as high as 24% per year on the loans they took out.  Some families also sold livestock in order to pay the recruitment fee.  The Plaintiffs' families were counting on Plaintiffs' income from the new jobs to pay off the large debts and replace their livestock.

61.     The men recruited by Moonlight signed employment agreements with Morning Star for the promised jobs before they departed for Amman, Jordan.  Moonlight applied for visas for the men under the sponsorship of the Royal Hotel.

62.     A Moonlight representative saw the men off at the Kathmandu airport.  He gave the Plaintiffs their passports, a plane ticket and a sealed envelope.  He told Plaintiffs that men would be in Jordan to meet them when they arrived at the airport.  Another group of Nepali men, all headed to work in Jordan, were on the same plane.

63.     When Plaintiffs arrived at the airport in Jordan, they were met by men holding a Moonlight sign.  The men took Plaintiffs' passports and the sealed envelopes.

64. The men drove Plaintiffs to a compound with a high wall around it and locked them in. Krishna Prasad Adhikari and others tried to force open the locked door, but it was too large and too sturdy. Plaintiffs were unable to get the door open.

65. Plaintiffs could not escape the compound. They were trapped.

66. The compound was crowded and dirty. There was only one toilet, and it was overflowing.

67. There was not enough food and water.

68. Plaintiffs and the other Nepali men held at the compound tried to talk to their captors, but the captors yelled at the Nepali men, signaled them to stop talking, and threatened them. The captors mimed tearing up the men's passports and threatened to kill them by drawing their fingers across their throats as if to slit their throats. Plaintiffs feared they would be harmed. Plaintiffs were held in the compound for some time.

69. Eventually, late one night, jeeps arrived at the compound. Plaintiffs were taken from the compound and loaded into the vehicles. They were not told where they were going. The Plaintiffs believed they were being taken to their worksites in Jordan.

70. Plaintiffs were driven for many hours. When they arrived at their destinations, the Plaintiffs believed they were still in Jordan.

71. Plaintiffs Sanjiv Gurung, Biplav Bhatta, Lukendra Gurung, and Krishna Prasad Adhikari later learned they had been taken to an American military base in Iraq called Camp Fallujah. Plaintiff Suraj Lamichhane later learned he had been taken to an American military base in Iraq called Al Taqaddum.

72.     Plaintiffs Krishna Prasad Adhikari, Sanjiv Gurung, Biplav Bhatta, and Lukendra Gurung did not know they were in Iraq until men who identified themselves as being from Daoud & Partners and wore Daoud & Partners badges told them where they were.

73.     Plaintiff Bhatta spoke more English than the others. From his first day at the base, Plaintiff Bhatta protested on behalf of himself and the other Plaintiffs that they were supposed to be working in Jordan, not Iraq, and had been brought to Iraq against their will. Plaintiff Bhatta also asked why their passports had been taken away and for the return of their passports. Plaintiff Bhatta protested to men from KBR and Daoud. In return, he was yelled at and told that he had been brought from Jordan to work.

74.     Plaintiff Bhatta told KBR employees almost every day that he and his friends had been promised jobs in Jordan, had been brought to Iraq against their will, and wanted their passports back. Other Plaintiffs similarly told their supervisors that they did not want to work in Iraq and wanted to be sent back. These Plaintiffs were also told that they had been brought to Iraq to work and that they would not be sent home.

75.     After the verbal protests proved fruitless, the Plaintiffs held at Fallujah took additional measures in their effort to return home. The Plaintiffs refused to work and demanded to be sent home. KBR and Daoud responded by refusing to provide food to the Plaintiffs unless they returned to work. Plaintiffs refused to work for five days, seeking to be returned home. After about five days, without food and no sign that KBR would relent, Plaintiffs were too hungry to continue their protest.

76.     When Plaintiff Lamichhane arrived at his worksite, a man introduced himself as his supervisor. His supervisor told him he would be working for KBR. When Plaintiff Lamichhane learned he was at Al Taqaddum, he told the KBR employees that he had been

promised a job in Jordan, been transported to Iraq against his will, that his passport had been confiscated and that he wanted to return home. The KBR employees told him he could not leave and that his passport would not be returned.

77.     The Plaintiffs worked cleaning the army mess hall, in the kitchen, serving food and washing dishes, collecting garbage, loading and unloading food containers and moving cargo.

78.     The Plaintiffs worked long hours, sometimes over 12 hours a day, often seven days a week. They received few days off.

79.     Their living conditions were difficult. Plaintiffs were housed in crowded shipping containers. There were not enough bathroom facilities to accommodate the third-country national workers, so Plaintiffs often had to wait in a long line to use the bathroom.

80.     Plaintiffs were secluded within the military base, physically restricted to a limited, segregated area and generally not allowed to move outside that area without an escort.

81.     Plaintiffs did not have unrestricted access to telephone service. During the time he was held at Fallujah, Plaintiff Bhatta was only permitted to phone home twice. One time he did not get through, and the other time he was able to talk to his wife for what seemed like just a minute. Mr. L. Gurung was not able to call home at all.

82.     Plaintiffs were paid far less for their work for KBR and Daoud than they would have earned at the promised jobs in Jordan. For example, Mr. L. Gurung and Mr. Adhikari had been promised about $400 a month working in Jordan, in a job that required eight-hour days six days a week. Instead, they were paid $285 a month after working 12 hour days, seven days a week.

24

83.     The Plaintiffs working at Fallujah were told that there were no facilities for sending money home.  Plaintiff Lamichhane at Al Taqaddum could not send money home for the first ten months because there were no wire transfer services available to him.  Plaintiffs worried about how their families were making ends meet.

84.     One day, the shipping container in which Mr. Adhikari was forced to reside caught fire and all the money he had earned until that point burned along with his other belongings.  He lost that money.

85.     Camp Fallujah and Al Taqaddum were in a war zone and subject to bombings, mortar fire and rocket attacks, causing Plaintiffs to be in a state of fear.

86.     KBR controlled Plaintiffs' access in and out of each base, as well as the means of transportation.  The bases were in a war zone.  Plaintiffs felt trapped and believed they had no way out.

87.     Eventually, each Plaintiff was allowed to return to Nepal in October 2005, early 2006 or January 2007, respectively.  Only at that time were their passports were returned to them.

88.     Plaintiffs were prevented from filing their claims sooner due to extraordinary circumstances beyond their control.  Plaintiffs are citizens of Nepal, one of the least developed countries in the world.  They were unable to bring their claims in Nepal, as that country lacks jurisdiction over the Defendants.

<u>The Plaintiffs were employed, obtained, harbored, and received by KBR.</u>

89.     KBR received, obtained, harbored, and employed Plaintiffs.

90.    Plaintiffs were trafficked to, and forced to labor at, military bases within the jurisdiction and control of the United States, on KBR's LOCGAP contracts, which were funded with U.S. dollars.

91.    During their time working on the bases, Plaintiffs were supervised by KBR. They were supervised by men wearing KBR identification and clothing.

92.    KBR's contract with its labor broker, Daoud, specified that the laborers would work under the complete direction, management and control of KBR and the men worked under KBR's direction, management, and control.

93.    In addition, KBR maintained and exercised the right to hire and fire the third-country national workers.

94.    At all times, KBR had the ability and authority to release the Plaintiffs and return them to their homes.

<u>KBR knew the third-country national laborers it obtained had been trafficked; notwithstanding this knowledge, KBR continued to use trafficked labor.</u>

95.    Well before Plaintiffs were trafficked, KBR knew that it was obtaining third-country national workers who had been promised jobs elsewhere and transported against their will to Iraq; were paid lower wages than promised; had their passports confiscated; were charged additional fees along the way; and were compelled to stay because they and their families were in debt to labor recruiters. KBR managers in the United States and in Iraq knew that KBR was obtaining third-country national workers who were subjected to these practices.

96.    KBR managers in the United States and in Iraq knew that their labor brokers, including Daoud, were using deceptive practices, including promising jobs elsewhere and transporting persons against their will to Iraq; paying lower wages than promised; confiscating

passports; withholding copies of contracts; charging exorbitant fees; and other coercive schemes, including threats of serious harm and abuse of legal process.

97.     KBR's own training materials defined trafficking to include the conduct described herein.

98.     As early as 2003, KBR began receiving reports that its third-country national workers had been deceived with promises of jobs in other countries and then forced to work for KBR in Iraq. For example, in 2003, a Nepali man named Sarad Sapkota was recruited to work as a cook in Oman but instead was taken to Iraq and coerced into working for KBR on a military base. He and other third-country nationals, including men from Nepal, India and Sri Lanka, repeatedly told KBR representatives that they had been forced to come to Iraq and wanted to leave. KBR representatives repeatedly responded that the men had no choice and would have to work in Iraq until their contracts were completed.

99.     Reports of human trafficking of third-country nationals, including reports specifically concerning KBR's subcontractor Daoud, were repeatedly received by KBR managers in both the United States and Iraq. KBR managers in the United States and in Iraq received such reports from the media, from diplomats, from members of the United States Armed Forces, from KBR's own employees and subcontractors, and from the third-country nationals themselves.

100.     These reports repeatedly described a variety of practices indicative of trafficking, including deception in recruitment, coercive recruitment fees that caused workers and their families to go deep into debt, nonpayment or underpayment of wages, and confiscation of workers' passports. By 2004, these reports had become common enough that KBR managers in the United States commented upon their reoccurrence.

101.    Repeated media inquiries and articles, including multiple reports by the New York Times, Reuters, the BBC and other press, concerned allegations that third-country nationals were being promised jobs elsewhere and then taken to Iraq to work against their will.

102.    These press reports and inquiries described men who were recruited for jobs elsewhere, landed in Kuwait or Jordan, were put in a truck, driven across the desert, and put to work at U.S. military bases, sometimes without realizing at first that they were in Iraq. The reports noted that the men had paid high fees to obtain the promised jobs and, in addition, had had their passports confiscated. The reports described the third-country national workers as trapped and coerced. These articles were in the files of KBR managers in the United States. For example, in May 2004, KBR managers in the United States received a list of questions from a New York Times reporter who had interviewed several Indian nationals who said they had been promised jobs in Kuwait and paid recruitment fees for those jobs, but were instead driven to a U.S. military base where they worked up to 18 hours a day, had their passports confiscated, and were paid less than promised; the men asked to leave, but were told that they had to work in Iraq and said they had no way to return home. U.S.-based KBR managers handled the response because it required "careful crafting with legal."

103.    KBR managers in the United States handled KBR's response to the media inquiries. As one U.S.-based KBR manager complained, "the press continues to dig up these stories and Houston insists on answering each one." KBR's U.S.-based press team distanced KBR from the wrongdoing and steered reporters away from labor brokers that were known to mistreat third-country national laborers, enabling the conduct to continue.

104.    KBR managers in both the United States and Iraq also received reports from KBR's own employees and auditors that the third-country nationals working for KBR were

28

victims of human trafficking.  Complaints regarding human trafficking were also provided to KBR by the U.S. Government, foreign diplomats and members of the U.S. military.

105.    Examples of such notice during a short period in late summer/early fall of 2004 include the following.

106.    In June 2004, the U.S. Government expressed concern that third-country nationals had been trafficked to Iraq, and reported to KBR that "Drivers are hired by brokers promising they would only work in Kuwait, charging them for job placement and then forcing them to go into Iraq or be discharged with no reimbursement."

107.    In July 2004, the Indian government complained to the U.S. government and KBR that KBR's subcontractor, Daoud, was holding Indian nationals in Iraq who wished to return home.

108.    In September 2004, a Lieutenant Colonel in the United States Marine Corps complained to KBR managers that its third-country nationals on the military base were "slave labor."

109.    In October 2004, a U.S. Marine Corps sergeant—in an email forwarded to KBR managers in the United States—complained that Nepali laborers at the base working for KBR had paid excessive recruitment fees, were not adequately fed, and were not being paid as promised.  The sergeant noted that he and other soldiers were providing winter clothes, supplies and food to the third-country nationals because the workers were in dire straits and were not getting enough to eat or provided appropriate clothing.

110.    Also in October, a KBR employee reported to several KBR managers that "KBR has been accused of running a 'slave labor camp' on Al Asad by different USMC commanders."

111.    Indeed, KBR knew that these Plaintiffs had been trafficked because Plaintiffs repeatedly told KBR employees that they had been brought into Iraq against their will, did not want to work in Iraq, wanted their passports returned, and wanted to return home. For example, Mr. Bhatta told KBR employees almost every day that he and other Nepalis had been deceived into coming to Iraq and that he wanted to return home. Mr. Lamichhane likewise told KBR employees that he had been brought to Iraq against his will; they responded that he could not leave and that his passport would not be returned.

112.    Other third-country nationals similarly told their KBR supervisors that they had been brought to U.S. military bases in Iraq against their will and wanted to return home. They were not sent home. Instead, they were told there was nothing to be done and they had to stay and work.

113.    Notwithstanding reports and complaints from Plaintiffs and other third-country national workers that they had been brought against their will and wished to return home, KBR did not return the workers to their homes.

114.    Despite repeated reports of continued abuses indicative of trafficking in persons, KBR continued to receive, obtain, and harbor third-country nationals from Daoud and the other labor brokers.

115.    KBR continued to receive, obtain, and harbor third-country nationals from Daoud despite knowing that trafficking crimes had been and were being committed.

116.    Notwithstanding the history of abuses committed by the labor brokers, including in particular by Daoud, KBR purposefully retained and continued to utilize their services.

117.    KBR sought and benefited from its use of labor brokers, and, in particular, sought and benefitted from its continued collaboration with and use of Daoud.

118. High-level managers of Defendants in the United States participated in and were responsible for making these decisions.

### KBR benefitted from the third-country national labor it obtained and continued to utilize Daoud so that it would continue to benefit

119. KBR required a large and steady supply of labor to fulfill its obligations under the LOGCAP contract. Thousands of workers were needed to pick up garbage, do the laundry, serve at the mess hall, and perform other menial, but necessary, tasks in support of KBR's contracts with the U.S. military. And it was not always easy to find workers willing to go to a war zone to perform low-wage labor.

120. A KBR manager in the United States described this third-country national labor as a commodity, along with portable toilets, dumpsters, and leased property.

121. KBR faced serious labor shortages. KBR managers in the United States and in Iraq closely tracked staffing numbers. KBR described the shortfalls in the number of laborers available to perform the necessary work in support of the U.S. military operations as an urgent problem and a crisis.

122. Obtaining workers through international recruitment was key to KBR's ability to meet its obligations under its U.S. military contracts.

123. KBR benefitted from Daoud's steady stream of foreign workers. KBR depended on Daoud's provision of foreign labor in order to meet its contractual obligations, and repeatedly pressured Daoud to obtain more staff.

124. KBR also benefitted from the low cost of third-country nationals it received and obtained from Daoud. The LOGCAP III contract, which was on a cost-plus-award-fee basis, provided KBR with a financial incentive to meet its contractual obligations on time and keep its overall costs low. KBR paid third-country national workers supplied by Daoud significantly less

than U.S. workers and set maximum wage rates for third-country national workers in its contracts with Daoud. Nepali workers were particularly cost-effective, as they were paid significantly less than other third-country nationals. On information and belief, KBR's use of third-country national workers was a cost avoidance measure that was used to determine the size of KBR's award fee.

125.   KBR's U.S.-based managers closely monitored the cost of labor provided by its labor brokers. KBR's U.S.-based executives and managers led a review of labor costs, and received detailed information about the cost of third-country national labor in Iraq under KBR's contracts with its labor brokers.

126.   Notwithstanding the history of abuses and that Daoud and other labor brokers continued to recruit, harbor, transport, provide, receive and obtain persons through means such as described herein and which constituted trafficking in persons and forced labor, KBR executives in the United States purposefully utilized and retained Daoud and other labor brokers and continued to do so over time.

127.   The human rights abuses of trafficking in persons and forced labor were a foreseeable consequence of KBR's purposeful and continued collaboration with, use of and support for Daoud and other labor brokers.

KBR took no effective steps to eliminate the abuses until ordered to do so by the United States; to the contrary, KBR sought to squash investigations

128.   KBR knew that Daoud and other labor brokers were involved in human trafficking while recruiting, harboring, transporting, providing, receiving and obtaining workers for KBR's contracts for the U.S. military, yet despite that knowledge, purposefully continued to collaborate with, contract with and use Daoud and the other labor brokers for years knowing the

conduct would continue, benefitting from it, taking no genuine steps to prevent or stop human trafficking or punish those responsible, and thereby demonstrating purpose and intent.

129.    KBR took no effective steps to eliminate the abuses; to implement or enforce an effective code of conduct; to discipline, penalize or remove the labor brokers who were implicated in human trafficking; or to reduce or terminate its reliance on Daoud and other labor brokers when they engaged in these foreseeable human rights violations.  To the contrary, KBR sought to squash allegations of forced labor and human trafficking and to silence potential whistleblowers.

130.    For example, KBR threatened to fire and did fire workers who reported abuses, including human trafficking.  KBR employees and managers knew that the third-country nationals had been promised jobs elsewhere but were transported to Iraq against their will. When these employees reported to their managers that the third-country nationals had been deceived and wanted to return home, they were told by KBR managers that nothing could be done, to "stay in their lane", and to "shut up" or be fired.  When one employee raised concerns about trafficking of third-country nationals with a KBR manager, that manager told the employee she "should shut up" and threatened that anyone who raised the issue with the military would be fired.  Other workers also were warned not to report trafficking or mistreatment of third-country nationals to the military, and threatened with firing.

131.    In another example, an outside auditor informed his supervisors in 2004 about nonpayment of wages, passport confiscation, and human trafficking by Daoud.  His concerns were forwarded to KBR managers in the United States, two of whom flew from the United States to meet with the auditor and threatened to have his employment terminated.  Ultimately, a KBR

executive in the U.S. made the decision to remove the auditor from his post. The auditor was reminded of the non-disclosure provision in his contract.

132.    KBR prohibited its employees from assisting laborers who were victims of practices indicative of trafficking. For example, when KBR's employees or contractors in Iraq attempted to give advice to third-country national laborers who reported that they were not being paid, KBR's U.S.-based managers prohibited such interactions.

133.    At one point, after many complaints about Daoud & Partners, one KBR manager suggested to more senior managers that "enough is enough" and that "we need to dump D&P as our master labor broker." His suggestion was rejected.

134.    In 2004, in response to reports of slave labor practices by Daoud, the U.S. military informed KBR that it would require copies of Daoud's contracts with third-country national workers. KBR managers objected, claiming it was an inappropriate intrusion into KBR's business.

135.    The same month, KBR managers discovered that a United States Marine Corps Lt. Colonel was requesting an investigation into KBR's subcontractor hiring practices. KBR managers decided "we need to squash this immediately," and took steps to do so.

136.    In March 2006, the U.S. military asked KBR to respond to allegations that its subcontractors were confiscating the passports of third-country nationals. KBR conducted an investigation of one of its subcontractors and confirmed that the subcontractor had been confiscating passports in order to prevent third-country national workers from moving freely around the base or accepting better-paying employment. KBR argued that if third-country nationals were free to accept other employment, the subcontractor would be "deprive[d] . . . of a revenue generating asset." KBR refused to investigate its other subcontractors.

137.     KBR's conduct enabled the trafficking and forced labor to continue.

138.     The information available to KBR managers on site and in the United States about the circumstances in which laborers arrived at the base, including about the manner in which they were trafficked to the base, indicate that KBR's conduct was purposeful in that it was knowingly and intentionally done for KBR's benefit despite KBR's knowledge that the trafficking and labor were in violation of U.S. laws and regulations and international law.

### KBR supervised, managed and controlled all aspects of the LOGCAP contract from its offices in the United States

139.     KBR's contract with the United States required KBR to provide logistical support including services such as transportation, dining services, facilities management, maintenance, and living accommodations for U.S. and coalition forces.  The United States paid KBR tens of billions of dollars in U.S. taxpayer funds for providing these services.

140.     KBR closely supervised, managed and controlled the performance of the services provided under the LOGCAP III contract, including the services and tasks performed by the third-country national laborers.

141.     KBR's administration, management, and supervision of the LOGCAP III contract were headquartered in the United States.  KBR's U.S.-based executives and managers had and exercised ultimate authority over all aspects of the LOGCAP III contract.

142.     For example, KBR's U.S.-based executives and managers established LOGCAP-wide organizational structures, functions, allocations of responsibilities, and standards and procedures.  KBR's U.S.-based executives and managers also controlled policies and procedures for the LOGCAP III contract, including those related to recruiting, procurement, and the selection of subcontractors.

143.    KBR contracted with labor brokers, including Daoud, to recruit and supply laborers. KBR's U.S.-based managers identified subcontractor capabilities; set evaluation criteria and scoring methodology; and selected subcontractors.

144.    KBR's subcontracts with labor brokers were approved by managers in the United States. Pursuant to KBR policy, these contracts also had to be approved by KBR's Law Department, which was based in the United States. Copies of KBR's contracts with Daoud were maintained in the United States.

145.    On information and belief, Daoud's selection and retention were approved by managers in the United States. On information and belief, change orders to KBR's contracts with Daoud to recruit and supply laborers were forwarded to the United States for approval by U.S. managers.

146.    KBR's U.S.-based managers closely supervised and managed the work at U.S. military bases under the LOGCAP contract. For example, KBR's U.S.-based managers directed project managers in Iraq to conduct specific tasks, specified which individuals would complete those tasks, and required verification that the tasks were completed. KBR's U.S.-based executives and managers led reviews of KBR's work in Iraq, recommended changes, and oversaw the implementation of those changes. When KBR's U.S.-based executives and managers had questions about the work on the bases, they demanded immediate answers from KBR's on-site representatives.

147.    KBR's U.S.-based managers traveled numerous times to the U.S. military bases in Iraq to manage the LOGCAP III contract. KBR's U.S.-based employees also rotated through the bases in Iraq, while other U.S.-based employees provided part- and full-time support long-

distance.  For example, the Houston Support Office circulated a monthly report and analysis that included reporting on staffing shortfalls, and followed up with conference calls.

148.     KBR's contracts with the U.S. military required many of its employees to obtain security clearances from the U.S. Government.  KBR's on-site representatives were recruited, screened, cleared, and processed by KBR's U.S.-based employees.

149.     KBR's contracts with labor brokers, including its contracts with Daoud, required the labor brokers to comply with U.S. laws and regulations, including the National Labor Relations Act, OSHA standards, Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family Medical Leave Act, the Fair Labor Standards Act, the U.S. Foreign Corrupt Practices Act, and the Federal Acquisition Regulations.  The contracts also specified that the contracts would be construed and governed in accordance with U.S. law.

150.     KBR required its labor brokers, including Daoud, to certify their compliance with certain U.S. laws.  KBR also required its labor brokers, including Daoud, to secure insurance to cover any liabilities under the Defense Base Act resulting from injuries to their employees. When Daoud failed to pay the premiums, KBR's U.S. insurance supervisors intervened to ensure that it made the payments.  KBR later undertook this responsibility itself, with KBR directly enrolling Daoud in KBR's Subcontractor DBA program and arranging payments by KBR for the premiums.  Workers injured on the military bases, including third-country nationals, received compensation through this program, which was administered in the United States.

151.     Daoud was paid over $400 million in U.S. taxpayer funds by KBR.  The fund transfers were approved by the Treasury Department and transferred from the United States

through banks in New York City. Daoud's contracts and invoices were reviewed and audited by the U.S. government.

152.    In the United States, the KBR Defendants monitored, managed, controlled and profited from Plaintiffs' forced labor. KBR's Houston, Texas, and Arlington, Virginia, offices exercised extensive monitoring, management, and control over operations at U.S. military bases in Iraq, including the bases where Plaintiffs were held and forced to labor.

153.    KBR's profits from its operations involving Plaintiffs' forced labor were collected in the United States.

### KBR's management and control extended to control over Daoud, including over the recruitment, transport, and employment of the third-country national laborers who were under KBR's direction, management and control

154.    KBR closely supervised, managed and controlled the provision of labor to U.S. military bases under the LOGCAP III contract.

155.    KBR exercised tight control over the recruitment of third-country national workers. In particular, KBR had the authority to exercise control and did exercise said control over Daoud's recruitment and supply of laborers. This authority and control resided in KBR management in the United States.

156.    KBR managers in the U.S. and Iraq knew that Daoud was recruiting and transporting workers from overseas, including from Nepal. KBR managers in the U.S. and Iraq knew Daoud was using a chain of labor brokers to assist in recruitment. Indeed, KBR employees were in communication with at least some of those sub-brokers.

157.    KBR possessed the authority and ability to exercise control over Daoud's use of sub-brokers. In its contracts with Daoud, which had to be approved by KBR's U.S.-based Law Department, KBR required Daoud to receive KBR's written approval before entering into

subcontracts. KBR had to approve the specific sub-brokers and mandated specific provisions that had to be included in contracts with any sub-brokers, including provisions requiring compliance with U.S. regulations. KBR also had to approve the form and terms and conditions of the subcontract.

158.    KBR controlled staffing levels and determined whether and when laborers would be recruited by Daoud. KBR sent its labor brokers, including Daoud, specific requests for workers. For example, KBR sent Daoud requisitions for third-country workers with specific skills and qualifications. Daoud recruited workers when requested by KBR to meet KBR's needs.

159.    KBR management in the United States closely monitored these staffing levels. KBR managers in the United States, including the LOGCAP General Manager, kept track of the number of workers provided by labor brokers, types of workers needed, reports on the arrival of third-country national laborers, and other recruitment-related matters. KBR's managers closely monitored labor shortages and critical personnel needs, including severe labor shortages by Daoud.

160.    KBR frequently expressed concerns to Daoud about the number of laborers Daoud was able to procure, and about the number of laborers available for work on particular projects or at particular work sites. KBR routinely sent emails to Daoud's managers expressing dissatisfaction with the number of laborers present on site, describing this issue as an urgent problem or crisis, and demanding information about when more laborers would be arriving.

161.    KBR required potential workers to pass medical exams and approved specific medical clinics in source countries, including in Nepal, to administer the exams. KBR's managers in the U.S. were provided reports on the medical clearance process. KBR routinely

audited whether laborers provided by Daoud complied with KBR's medical requirements, and removed employees whom KBR found deficient.

162.    At all times, KBR had the authority to hire and fire the third-country nationals, and it exercised that authority.  For example, KBR reserved the right to screen and evaluate personnel before accepting a candidate for employment.  KBR exercised this right, often requesting additional paperwork on new recruits before authorizing their hire and at times rejecting candidates proposed by Daoud.  KBR also exercised its authority to fire.  KBR managers would inform Daoud that KBR had terminated laborers recruited by Daoud.  On other occasions, KBR instructed Daoud not to terminate workers until KBR determined the proper course of action.

163.    KBR knew that laborers were processed through Jordan.  KBR controlled the transport of laborers into Iraq and onto the military bases.  KBR's approval was required before an individual was permitted onto the base, and KBR assisted its labor brokers in planning and arranging laborers' travel into Iraq and onto the military bases.

164.    Once the third-country nationals arrived at the military base, KBR had complete direction, management and control of the third-country national workers.

165.    KBR's contracts with Daoud provided KBR with complete control over every aspect of the laborers' work, from their hours and locations of employment to their break areas and wage rates.  KBR's contracts further specified that the laborers would work under the complete direction, management, and control of KBR, not Daoud.

166.    KBR exercised day-to-day management and control over the laborers.

167.    KBR determined the pay of the third-country nationals.  The pay rates were approved by managers in the United States.

168.    KBR set work hours and work locations for the third-country nationals, requiring that they be available at times and locations specified by KBR.   KBR provided the tools and equipment.   KBR even supplied the time sheets for the workers, which were signed by KBR supervisors.

169.    KBR supervisors at the worksites directed the third-country nationals, supervised them, and gave them orders.   Third-country nationals received orders and directions from men from KBR, and did not have much contact with anyone from Daoud.

170.    KBR determined the third-country nationals' living and working conditions. KBR inspected the labor camps and their conditions, and exercised control over them.

171.    KBR controlled the provision of equipment to third-country nationals.   For example, the Project General Manager in Houston circulated a policy providing that KBR, not KBR's labor brokers, would determine when protective body armor would be required.

172.    KBR's U.S. managers closely supervised KBR's use of third-country national laborers.   For example, KBR's U.S. managers required daily reports on LOCGAP operations and progress, including detailed information about the recruitment and oversight of third-country nationals such as labor shortages and critical labor needs, arrivals of laborers, delays in moving laborers across the border, training of third-country national workers, labor crew tasks, the exact numbers of third-country nationals on site, and KBR's interventions with sub-labor brokers. Additional reports were routinely sent to KBR's U.S. managers, such as reports regarding security incidents with KBR's labor brokers, performance issues with KBR's subcontracted laborers.   These reports routinely documented problems with Daoud, including everything from severe labor shortages to failure to follow procedures to issues paying third-country nationals.

173.     KBR's executives in the United States used and responded to these reports, requiring KBR's on-site managers to call them, even on weekends, to provide explanations and updates.

174.     KBR had ultimate control over the third-country nationals' passports. KBR justified the confiscation and retention of third-country national passports by its labor brokers as necessary to prevent the workers from departing to obtain more lucrative jobs, which would deprive KBR's labor brokers of a "revenue generating asset." KBR intervened with the military in an attempt to halt the workers from leaving one labor broker for another, expressing concern that such movements led to "cost increases."

175.     At all times, KBR had the right to release and return the third-country nationals.

<u>KBR controlled the manner and means of Daoud's day-to-day operations in Iraq</u>

176.     KBR maintained close control of Daoud. KBR managers gave detailed instructions to Daoud's site managers and subcontractors, which Daoud followed. KBR even had the authority to fire or re-assign Daoud's managers, and it exercised that authority.

177.     KBR controlled the manner and means by which Daoud performed its daily operations. For example, KBR retained approval of the menus for dining services, and did not permit Daoud to change those menus without prior approval from KBR. No detail was too small for KBR's control. For example, KBR specified the window dressings and pictures to be displayed in the dining facilities, required signage and sneeze guards for the salad bars, and mandated that the housing provided to laborers to be organized in rows. KBR's involvement in Daoud's daily operations included daily inspections of the forks, spoons, pans and spatulas used by Daoud in the dining facility.

178.    KBR's on-site representatives monitored Daoud's daily operations, including minute details.  For example, in September 2004, KBR instructed Daoud to improve the quality of the laborers' uniforms.  KBR also mandated the number of times each day that water quality had to be measured, specified how equipment log books should be completed, and conducted inspections to make sure Daoud complied with KBR's requirements.

179.    KBR required Daoud to provide daily reports to KBR.  Among other things, KBR required reports on the status of the laborer workforce in Iraq, delays in arrivals of laborers, and other information related to the progress of the work.   KBR also required Daoud to complete various daily checklists.

180.    KBR closely monitored Daoud's bills and payments, including support documentation for expenses such as the laborers' timesheets.

181.    KBR possessed and exercised the right to inspect and audit all aspects of Daoud's operations, and such inspections and audits occurred frequently.  KBR issued Cure Notices to Daoud detailing deficiencies in Daoud's performance, requiring specific changes, and reminding Daoud that KBR had the authority to terminate Daoud's contract based on such deficiencies.

182.    KBR managers also met in person with Daoud's managers to review Daoud's deficiencies.  In September 2004, KBR held a two-day review of Daoud's performance at various sites throughout Iraq, including issues with temporary laborers and their living conditions.

183.    Over time, several KBR employees came to work for Daoud, either directly or as consultants, better enabling Daoud to meet KBR's requirements.  At least some returned to KBR after their stint at Daoud.

184.     KBR exercised effective control over Daoud through its control of the means and manner of Daoud's daily work, including Daoud's recruitment of the laborers.

### KBR had the authority to prohibit the conduct alleged herein, and that authority resided with managers in the United States

185.     At all times, KBR had the authority to require that only licensed and registered labor brokers be used, to prohibit recruitment fees from being charged, to prohibit passports from being confiscated, to require that workers be provided a copy of their contracts, and to terminate subcontractors who engaged in human trafficking. That authority resided in the United States. When KBR eventually took action in response to requirements imposed by the U.S. military, the implementation was ordered, directed, supervised, and verified by KBR's executives and managers in the United States.

186.     KBR likewise managed the receipt of and response to allegations of abuses, including allegations of human trafficking, from the United States. KBR designated an attorney in the United States to receive reports of legal violations, including reports of human trafficking, and also set up a Houston email and postal address to receive complaints. Complaints also were made to KBR's Ethics and Compliance Hotline in the United States. Pursuant to KBR policy, allegations were, when necessary, brought to the attention of the Audit Committee or the Board of Directors, which were both in the United States.

187.     Complaints of abuses of KBR's laborers were submitted directly to the U.S. by KBR's managers and third-country nationals. Other complaints made by third-country nationals to KBR's on-site representatives, including complaints about Daoud, were forwarded to KBR's managers in the United States.

188.     KBR's trafficking in persons compliance, policies, and initiatives were managed from the United States.

189.    At all times, KBR's U.S.-based executives and managers had the authority to stop KBR's labor brokers, including Daoud, from relying on abusive and deceptive practices such as withholding workers' contracts, confiscating workers' passports, or using sub-brokers that charged excessive recruitment fees.

190.    After learning that KBR had obtained victims of human trafficking as laborers, KBR managers in the United States had at all times the ability to release and return the laborers. But KBR managers did not do so and continued to retain the laborers, knowing they had been trafficked.

191.    KBR substantially assisted its agents and/or participants in the pattern, scheme, or plan to obtain third-country nationals.  The management and logistical support provided by KBR had a substantial effect in bringing about the violations alleged herein.

192.    But for KBR's conduct, the abuses alleged herein would not have occurred as they did.

## V.    CAUSES OF ACTION

**COUNT I**
**Violations of the Trafficking Victims Protection Reauthorization Act**
**("TVPRA"),**
**18 U.S.C. § 1595**

193.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth here.

194.    Plaintiffs are victims of forced labor and human trafficking in violation of 18 U.S.C. §§ 1589 and 1590.

195.    Defendants' conduct was knowing.

196.    Defendants obtained the labor and services of Plaintiffs by threats of serious harm and physical restraint against Plaintiffs.

197.    Defendants obtained the labor and services of Plaintiffs by means of a scheme, plan or pattern intended to cause the Plaintiffs to believe that, if the Plaintiffs did not perform such labor or services, Plaintiffs would suffer serious harm or physical restraint and their family members would suffer serious harm.

198.    Defendants obtained the labor and services of Plaintiffs by means of the abuse or threatened abuse of law or the legal process.

199.    Defendants, their agents and/or the other participants in the plan, scheme or pattern, knowingly recruited, harbored, transported, provided, and obtained the Nepali Laborers for labor or services by means of violations of Title 18, Chapter 77.

200.    Defendants, their agents and/or the other participants in the plan, scheme or pattern, physically restrained the Plaintiffs, including holding them in a locked compound in Jordan from which they could not escape; threatening to kill them; transporting them to U.S. military bases in Iraq without their consent; withholding their passports and preventing them from freely leaving the military base where they were forced to work.

201.    Defendants and/or their agents withheld food from Plaintiffs Krishna Prasad Adhikari, Biplav Bhatta, Lukendra Gurung, and Sanjiv Gurung in order to compel them to work, causing Plaintiffs to fear serious harm.

202.    Defendants' agents, and/or other participants in the plan, scheme or pattern to traffic in persons transported laborers from Nepal and other source countries to Jordan with the promise of lucrative jobs, and then took them to U.S. military bases in Iraq against their will.

Defendants and/or their agents obtained Plaintiffs' labor by means of this scheme, plan or pattern.

203.    Defendants, their agents and/or participants in the plan, scheme or pattern to traffic in persons withheld Plaintiffs' passports, threatened to tear up Plaintiffs' passports, and brought Plaintiffs to U.S. military bases in Iraq even though Plaintiffs' visas and work permits were for jobs at a hotel in Jordan.

204.    Defendants did not permit Plaintiffs to return home, despite repeated requests. Defendants did not return Plaintiffs' passports, despite repeated requests, until Plaintiffs were permitted to return home.

205.    Defendants committed these violations of 18 U.S.C. §§ 1589 & 1590 while serving as contractors of (a) the Department of Defense (including a nonappropriated fund instrumentality of the Department); and/or (b) any other Federal agency, or any provisional authority, and Defendants were supporting the mission of the Department of Defense overseas.

206.    As a result of the conduct of Defendants and their agents and/or other participants in the alleged plan, scheme, or pattern, Plaintiffs have suffered damages in an amount to be determined at trial.

207.    Plaintiffs are entitled to recover damages and reasonable attorneys' fees for the wrongful conduct of Defendants and their agents and/or other participants in the alleged plan, scheme, or pattern.

## COUNT II
### Alien Tort Claims Act, 28 U.S.C. § 1350

208.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if set forth fully here.

209.    Plaintiffs are aliens.

210.    Defendants' actions as set forth above constitute the torts of trafficking in persons, slavery-like practices, involuntary servitude, and forced labor.

211.    Trafficking in persons is a modern day form of slavery, and along with involuntary servitude and forced labor constitutes a tort in violation of the law of nations and/or in violation of treaties of the United States.

212.    The conduct described in this Complaint constitutes the torts of prolonged arbitrary detention and/or false imprisonment, which also constitute torts in violation of the law of nations and/or in violation of the treaties of the United States.  These actions, which were committed in order to fulfill a contract with the U.S. government to support U.S. troops on a military base under the jurisdiction and control of the United States, were committed under color of law.

213.    The law of nations, including customary international law, is reflected, expressed and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities, including but not limited to the Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Nov. 15, 2000, G.A. Res. 55/25, Annex II to the United Nations Convention Against Transnational Organized Crime, U.N. GAOR Supp. (No. 49), U.N. Doc. A/45/49 (Vol. I) (2001); Convention Concerning the Abolition of Forced Labor, June 25, 1957, 320 U.N.T.S. 291; Supplemental Convention on the Abolition of Slavery, the Slave Trade and Institutions and Practices Similar to Slavery, Sept. 27, 1956, 266 U.N.T.S. 3; Convention for the Suppression of the Traffic in Persons And of the Exploitation of the Prostitution of Others (1951); Convention Concerning Forced or Compulsory Labour, June 28, 1930, 39 U.N.T.S. 55; Convention to Suppress the Slave Trade and Slavery (1926); Universal

Declaration of Human Rights, G.A. Res. 217A (Ill.), U.N. Doc. A/810, at 71 (1948); the International Covenant on Civil and Political Rights, Dec. 19, 1966, 999 U.N.T.S. 171, 61 I.L.M. 368; and the International Labour Organisation (ILO) on Fundamental Principles and Rights at Work, International Labour Conference (ILC) 86th Sess., June 19, 1998, § 2(c), 37 I.L.M 1233.

214.    As set forth in detail above, Defendants engaged in and/or are responsible for acts, including acts by their agents and/or other participants in the plan, scheme or pattern to traffic in persons, that constitute the recruitment, transportation, transfer, harboring or receipt of Plaintiffs. These acts were conducted by means of the threat or use of force or other means of coercion, abduction, fraud, deception, and the abuse of power or a position of vulnerability. The acts were undertaken for the purpose of exploitation, including for the purposes of obtaining labor and services from Plaintiffs. Defendants' conduct was intentional.

215.    Plaintiffs suffered injuries and damages as a result of these actions by Defendants.

216.    As set forth in detail above, Plaintiffs' claims touch and concern the United States because they were injured by U.S. national defendants that contracted with and worked on behalf of the U.S. military on a military base under the jurisdiction and control of the United States, and because substantial relevant acts and omissions occurred in the United States.

### COUNT III
### The Transitional Law of Iraq

217.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if set forth fully here.

218.    The Law of Administration for the State of Iraq for the Transitional Period forbids slavery, the slave trade, forced labor, and involuntary servitude with or without pay. Trans. Admin. L. art. 13.

219.    The Transitional Administrative Law incorporates international treaties, agreements, and the law of nations.

220.    Defendants violated the Transitional Administrative Law by engaging in forced labor and involuntary servitude with pay.

221.    Defendants further violated the Transitional Administrative Law by engaging in violations of the law of nations, including trafficking in persons, involuntary servitude, forced labor, and prolonged detention. Defendants' actions, which were committed in order to fulfill a contract with the U.S. government to support U.S. troops on a military base under the jurisdiction and control of the United States, were committed under color of law.

222.    Plaintiffs suffered injuries and damages as a result of these actions by Defendants.

### COUNT IV
### Violation of the Iraqi Civil Code

223.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if set forth fully here.

224.    Defendants recruited and obtained Plaintiffs' labor and services through force, fraud and coercion in violation of Iraqi law.

225.    Defendants committed acts injurious to Plaintiffs and inflicted injury.

226.    Plaintiffs suffered direct and material and ethical damage from the offenses committed by Defendants.

227.    Plaintiffs are entitled to compensation under the Iraqi Civil Code, including Articles 202, 203 and 204.

### COUNT V
### False Imprisonment

228.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs as if set forth here.

229.     Defendants restrained Plaintiffs' liberty without any sufficient legal excuse.

230.     Defendants used force, words and/or acts which Plaintiffs were afraid to ignore and/or to which they reasonably believed they must submit.  Defendants caused Plaintiffs to be transported to a U.S. military base in hostile territory which they could not leave, controlled Plaintiffs' access in and out of each base, physically restricted Plaintiffs to a limited segregated area from which they generally could not move without escort, and refused to return Plaintiffs' passports or permit them to return home.

231.     Defendants' actions caused Plaintiffs severe mental distress, including extreme fear and depression.

## COUNT VI
### Negligence

232.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs as if set forth here.

233.     Defendants had a duty of reasonable care toward Plaintiffs to ensure that neither Defendants nor their agents engaged in conduct leading to or likely to lead to foreseeable harm, as described herein.  Defendants failed to use due care to protect the Plaintiffs from foreseeable harm.

234.     Defendants had a duty to the Plaintiffs to take reasonable care to ensure that personnel whom Defendants retained to perform services were not unfit, incompetent or otherwise dangerous to the Plaintiffs.

51

235.     At all relevant times, Defendants had the power, ability, authority and duty to stop engaging in the conduct described herein and to intervene to prevent or prohibit such conduct.

236.     Defendants breached the duty of care that they owed Plaintiffs.  In engaging in the conduct alleged herein, including the retention of personnel, Defendants and/or their agents have not acted as ordinarily prudent and careful persons would act in similar circumstances.

237.     Defendants' breach of the duty of care that they owed the Plaintiffs is the proximate cause of Plaintiffs' damages, as alleged herein.

## COUNT VII
### Negligent Hiring

238.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs as if set forth herein.

239.     Defendants contracted with Daoud to perform work at and provide services for KBR facilities in Iraq.  Defendants had a duty to the Plaintiffs to take reasonable care to ensure that Daoud was not unfit, incompetent or otherwise dangerous to Plaintiffs.

240.     Despite actual or constructive knowledge that Daoud was unfit, incompetent or otherwise dangerous, the KBR Defendants hired, retained, and/or contracted with Daoud to provide services at KBR's facilities in Iraq.  At the time Defendants contracted with Daoud and at all other relevant times, the KBR Defendants knew or reasonably should have known that Daoud personnel were unfit, incompetent, and/or dangerous and, as a result, would intentionally and/or negligently harm, did harm and would continue to harm Plaintiffs, as alleged herein.

241.     Defendants failed to exercise reasonable care in contracting with Daoud to perform work.  Defendants thereby breached their duty to the Plaintiffs, who suffered harm and injury.

242.     As a direct and proximate result of these violations, the Plaintiffs suffered injuries as alleged herein.

243.     As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered injuries entitling them to damages in amounts to be proven at trial.

**COUNT VIII**
**Negligent Supervision**

244.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs as if set forth herein.

245.     When engaging in the wrongful conduct alleged herein, Daoud was acting as an agent of the Defendants.  Defendants had a duty to the Plaintiffs to take reasonable care to ensure that Daoud personnel whom the KBR Defendants supervised were not unfit, incompetent or otherwise dangerous to the Plaintiffs.

246.     Defendants exercised control over the operative details of the services provided by Daoud personnel.

247.     Defendants had the authority to supervise, prohibit, control, and/or regulate Daoud personnel so as to prevent these acts and omissions from occurring.  Defendants also had the ability to halt Daoud's work until such time as the tortious conduct alleged herein were stopped and/or prevented.

248.     Defendants knew or reasonably should have known that the Daoud personnel would create a risk of harm and actually harm or otherwise violate Plaintiffs' rights, and that, as a direct and proximate result of those violations, the Plaintiffs would suffer injuries as alleged herein.

249.     Defendants knew or reasonably should have known that unless they intervened to protect the Plaintiffs and properly supervise, prohibit, control and/or regulate the conduct described herein, Daoud personnel would perceive their acts and omissions as being ratified and condoned.

250.     Defendants failed to exercise due care by failing to supervise, prohibit, control or regulate Daoud personnel.  Defendants breached their duty to the Plaintiffs, who suffered harm and injury.

251.     As a direct and proximate result of the Defendants' negligent supervision of Daoud personnel, the Plaintiffs have suffered injuries entitling them to damages in amounts to be proven at trial.

## COUNT IX
### Intentional Infliction of Emotional Distress

252.     Plaintiffs reallege and incorporate by reference the allegations set forth above  as if set forth fully here.

253.     Defendants acted with intentional or reckless disregard of the impact their activities would have on Plaintiffs.  Defendants had the specific purpose of inflicting emotional distress or, at a minimum, intended their conduct and knew or should have known that emotional distress would likely result.  Trafficking human beings into a war zone and against the will of those being trafficked reflects, at a minimum, a reckless disregard for the likelihood of causing emotional distress.

254.      Plaintiffs were subject to outrageous and intolerable conduct by Defendants and/or their agents.  As described above, Defendants' activities were part of a pattern of conduct

designed to ensure sufficient cheap labor for the LOGCAP contract and are utterly intolerable in a civilized community.

255.     Defendants' actions in obtaining trafficked labor and refusing to let trafficked human beings return home directly caused the Plaintiffs' severe emotional distress.

256.     Defendants' conduct caused Plaintiffs severe emotional distress.  Defendants and/or their agents sought out vulnerable potential workers such as Plaintiffs.  Defendants' disregard for Plaintiffs' safety and wellbeing, including forcing them to work against their will in a war zone without adequate protection and refusing to let them return to their homes and families despite repeated requests, caused extreme fear, depression and emotional distress in all Plaintiffs, leading to severe emotional injury.


PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court will enter an order:

(a)     Entering judgment in favor of each of the Plaintiffs on all counts of the Complaint;

(b)     Awarding each of the Plaintiffs damages, including compensatory and punitive damages;

(c)     Granting each of the Plaintiffs equitable relief, permanently enjoining Defendants from further engaging in abuses against Plaintiffs and their fellow laborers;

(d)     Awarding each of the Plaintiffs the costs of suit including reasonable attorneys' fees, and

(e)     Granting such further relief as this Court deems just and equitable.

Dated:  September 28, 2015

Respectfully submitted,

Stephen B. Pershing (VIRGINIA BAR #31012)
1416 E Street, N.E.
Washington, DC  20002
Tel: 202-642-1431

Josh S. Devore (VIRGINIA BAR #45312)
Elizabeth Aniskevich (VIRGINIA BAR #81809)
Agnieszka M. Fryszman
Alysson Ford Ouoba
COHEN MILSTEIN SELLERS &
  TOLL PLLC
1100 New York Ave., N.W.
East Tower, Suite 500
Washington, DC  20005
Tel: 202-408-4600
Fax:  202-408-4699

Paul L. Hoffman
Catherine Sweetser
SCHONBRUN DESIMONE SEPLOW
  HARRIS & HOFFMAN LLP
723 Ocean Front Walk
Venice,  CA 90291
Tel:  310-396-0731
Fax:  310-399-7040

Anthony DiCaprio
Attorney at Law
64 Purchase Street
Rye, NY  10580
Tel:  917-439-5166

Victor Glasberg (VIRGINIA BAR #16184)
121 S. Columbus Street
Alexandria, VA  22314
Tel:  703-684-1100
Fax:  703-684-1104

Attorneys for Plaintiffs