**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **KRISHNA PRASAD ADHIKARI**, *et al*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:16-CV-2478** |
| | § | |
| **KBR INC.,** *et al*, | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendants' Motion to Dismiss. (Doc. No. 83.) After considering the Motion, the responses thereto, and all applicable law, the Court determines that the Motion should be granted in part and denied in part.

### I.  BACKGROUND

The plaintiffs in this case, five Nepali men, allege that they were promised work in Jordan but were instead trafficked to work for KBR, a U.S. defense contractor, on a U.S. military base in Iraq. (Doc. No. 1 at 1–2.) Plaintiffs brought claims against KBR and various KBR subsidiaries under the Trafficking Victims Protection Reauthorization Act (TVPRA), the Alien Tort Claims Act (known more commonly as the Alien Tort Statute, or ATS), and Iraqi law, as well as claims of false imprisonment, negligence, negligent hiring, negligent supervision, and intentional infliction of emotional distress. *Id.* Defendants have moved to dismiss all claims. (Doc. No. 83.)

The claims in this case ("*Adhikari II*") are similar, though not identical, to the claims brought in *Adhikari v. Daoud & Partners*, Civil Action No. 4:09-CV-1237 ("*Adhikari I*"). As in

the instant case, the *Adhikari I* complaint alleged that different Nepali men had also been trafficked to work on a U.S. military base in Iraq after being promised work in Jordan. (Doc. No. 83 at 1.) In *Adhikari I*, summary judgment was granted to Defendants on all claims. *Adkhikari v. Kellogg, Brown & Root, Inc.*, 845 F.3d 184, 191 (5th Cir. 2017). The Fifth Circuit affirmed. *Id.*

## II.   LEGAL STANDARD

A court may dismiss a complaint for a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, a complaint must contain sufficient factual matter that, if accepted as true, the complaint would "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S at 556). The plausibility standard "is not akin to a 'probability requirement,'" though it does require more than a "sheer possibility" that a defendant has acted unlawfully. *Id.*

Ultimately, the question for the court to decide is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. The court must accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal*, 556 U.S. at 678 (citation omitted). The court should not "strain to find inferences

favorable to the plaintiffs" or "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'" *R2 Investments LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc*., 365 F.3d 353, 361 (5th Cir. 2004)). The court should not evaluate the merits of the allegations, but must satisfy itself only that plaintiff has adequately pled a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp*., 355 F.3d 370, 376 (5th Cir. 2004).

## III.    ANALYSIS

### A.  Trafficking Victims Protection Reauthorization Act

Defendants argue that Plaintiffs cannot state a claim under the TVPRA because: (1) the alleged trafficking took place prior to 2008; (2) the TVPRA did not apply extraterritorially before 2008; and (3) the 2008 amendment to the TVPRA is not retroactive. (Doc. No. 83 at 4–7.) This argument reiterates the conclusions that the Fifth Circuit reached on the TVPRA claims in *Adhikari I*.  845 F.3d at 200–06. In response, Plaintiffs argue that extraterritoriality is beside the point. (Doc. No. 87 at 24.) According to Plaintiffs' allegations, "KBR violated the TVPRA *inside of the United States* through its actions to aid and abet the trafficking of Plaintiffs." (*Id.*) (emphasis in original). Plaintiffs point to allegations in the Complaint that U.S.-based KBR personnel: analyzed staffing patterns in Iraq to detect labor shortfalls;[1] exercised control over Daoud & Partners' recruitment and supply of workers;[2] supervised medical clearances for workers;[3] determined the workers' pay rates;[4] set policy for the workers' equipment use;[5]

---

[1] Doc. No. 1 ¶ 147.

[2] Doc. No. 1 ¶¶ 141–46, 155–57, 159, 172–73.

[3] Doc. No. 1 ¶ 161.

transmitted payments comprising all of Daoud's revenue;[6] intervened to ensure that Daoud maintained liability insurance to comply with U.S. law;[7] conducted legal reviews of Daoud's subcontracts;[8] assigned staff and designated a hotline, email, and postal address to process trafficking complaints;[9] received reports from media, the U.S. military, and other sources about trafficking;[10] brought reports about trafficking to the attention of KBR's U.S.-based Board of Directors;[11] developed responses to trafficking allegations;[12] and provided direction once the U.S. military imposed requirements on labor brokers.[13] Plaintiffs further allege that U.S.-based KBR personnel failed to take steps to eliminate trafficking and that they profited from the alleged scheme. (*Id.* at 12.) As such, Plaintiffs argue that KBR's domestic activity is sufficient to create liability under the TVPRA.

Statutes are presumed not to have extraterritorial application absent congressional intent to the contrary. *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010). In applying the presumption against extraterritoriality to a particular statute, courts use a two-step inquiry. *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016). First, the court must determine

---

[4] Doc. No. 1 ¶ 167.

[5] Doc. No. 1 ¶ 171.

[6] Doc. No. 1 ¶ 31.

[7] Doc. No. 1 ¶ 150.

[8] Doc. No. 1 ¶ 157.

[9] Doc. No. 1 ¶ 186.

[10] Doc. No. 1 ¶ 99.

[11] Doc. No. 1 ¶ 186.

[12] Doc. No. 1 ¶¶ 102–03 (alleging a KBR employee in the U.S. said, "the press continues to dig up these stories and Houston insists on answering each one"), 186–90.[13] Doc. No. 1 ¶ 185.

[13] Doc. No. 1 ¶ 185.

whether the statute gives a clear, affirmative indication that it applies extraterritorially. *Id.* In *Adhikari I*, the Fifth Circuit ruled that the TVPRA did not give such an indication prior to the 2008 amendment. 845 F.3d at 191. Second, the court must determine whether the case involves a domestic or extraterritorial application of the statute. *RJR Nabisco*, 136 S. Ct. at 2101. In cases involving both conduct in the United States and conduct abroad, the court looks to the "'focus' of Congressional concern" in enacting the statute. *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 266–70 (2010) ("For it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States" (emphasis in original)). "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *RJR Nabisco*, 136 S. Ct. at 2101. On the other hand, if the conduct relevant to the statute's focus occurred in a foreign country, then the case involves an extraterritorial application. *Id.*[14] As the Supreme Court made clear in *RJR Nabisco*, this analysis must be done separately for each statutory provision at issue. *Id.* at 2106–10.

Few courts have examined the TVPRA's focus for the purposes of the extraterritoriality analysis. Contrary to Defendants' argument (Doc. No. 91 at 5–6), the Fifth Circuit did not do so in *Adhikari I*. Two district courts have said that the focus of the TVPRA is "where the forced

---

[14] For example, in *Morrison*, the Supreme Court considered whether § 10(b) of the Securities Exchange Act of 1934 was being applied domestically or extraterritorially. 561 U.S. 247 (2010). The alleged misrepresentations that formed the basis of the claim were made in the United States and were about an American company, but the securities that were affected were only traded on a foreign stock exchange. *Id.* at 251–53. The Supreme Court found that the focus of § 10(b) was "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Id.* at 267. The Court therefore focused on where the securities were traded rather than where the misrepresentation occurred. *Id.* Because the securities were only traded on a foreign exchange, imposing liability would require an extraterritorial application of the statute.

labor occurred and to where … victims were trafficked." *Samuel v. Signal Int'l L.L.C.*, 2015 WL 12765986, at *3 (E.D. Tex. Jan. 26, 2015) (quoting *Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 2012 WL 5378742, at *6 (C.D. Cal. Aug. 27, 2012)). These cases examined trafficking schemes that brought workers into the U.S. after employing some deception or coercion in the workers' countries of origin. *Samuel*, 2015 WL 12765986, at *1 (describing false promises made and debts incurred prior to arrival in the U.S.); *Tanedo*, 2012 WL 5378742, at *1–2 (describing advertisements, misleading job offers, and financial coercion experienced prior to U.S. arrival). Tasked with deciding whether trafficking that began elsewhere and ended in the U.S. entailed a domestic or extraterritorial application of the TVPRA, those courts sensibly selected the former. Interpreting the law otherwise would leave it with little force or effect.

The allegations in the present case are different. Plaintiffs' allegations detail a transnational human trafficking scheme that moved workers through various foreign countries but never brought them to the U.S. Viewed in the most favorable light, as they must be, Plaintiffs' allegations also indicate that actors in the U.S. instigated, directed, funded, protected, and perpetuated the exploitation of those workers. These domestic actors' activities entailed close collaboration with partners on the ground that interacted directly with the trafficking victims. The direct trafficking activities clearly are within the focus of the TVPRA. The present question is whether the activities of the domestic participant in the scheme, without which the trafficking would not have occurred, are also within the focus of Congressional concern.

The Trafficking Victims Protection Act of 2000 has been amended several times since its enactment. Plaintiffs allege violations of the law occurring after the United States' invasion of Iraq in 2003 and ending in 2007. (Doc. No. 1 at 3–9.) The version of the law in effect for that period has three relevant provisions: Section 1589, prohibiting forced labor; Section 1590,

prohibiting trafficking; and Section 1595, a civil remedy. Section 1589 subjected to fine or imprisonment anyone who

> knowingly provides or obtains the labor or services of a person—
>
> (1) by threats of serious harm to, or physical restraint against, that person or another person;
>
> (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or
>
> (3) by means of the abuse or threatened abuse of law or the legal process.

Trafficking Victims Protection Act of 2000, Pub. L. 106-386, § 112(a)(2) (2000). Section 1590 subjected to fine or imprisonment anyone who "knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter ...." *Id.* Section 1595 allowed "an individual who is a victim of a violation of section 1589, 1590, or 1591 of this chapter [to] bring a civil action against the perpetrator in an appropriate district court of the United States and [to] recover damages and reasonable attorneys fees." Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. 108-193, § 4(a)(4)(A) (2003). Not until 2008 did the law gain the provision that confers extraterritorial jurisdiction on the federal courts. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. 110-457, § 223(a) (2008) (codified at 18 U.S.C. § 1596).

The focus of the TVPRA identified in *Samuel* and *Tanedo*—"where the forced labor occurred and to where … victims were trafficked"—is a plausible interpretation of Section 1589. That statute's text speaks specifically of the means and mechanisms of coercion used to extract forced labor. It is reasonable, therefore, to conclude that Congress's focus was on the location where the forced labor occurred, given that the prohibited techniques of coercion are likely to be employed at the same site. In the present case, the forms of coercion listed in Section 1589 all

occurred entirely in foreign countries. As such, applying Section 1589 to the facts of the case appears to be an extraterritorial application of the statute.

By contrast, the trafficking provision, Section 1590, is more broadly stated than the forced labor provision. Proof of Section 1590 is not reliant on evidence of specific types of threats. Rather, it sweeps in all those who "obtain[] by any means" a person for labor or services. Where Section 1589's focus is only on those who wield the prod, Section 1590's focus appears broad enough also to include those who urge and direct its use.

This Court has said previously that "Congress intended Sections 1589 and 1590 to be purely national solutions." 994 F. Supp. 2d at 836–37. It does not alter that conclusion as to Section 1590 now. What the Court holds, instead, is that a domestic actor may participate so substantially in a trafficking scheme abroad that its activities come within the focus of Congress's concern when it enacted Section 1590. To hold otherwise would be to reward the scheme's mastermind for constructing layers of legal and organizational insulation.

Congress's purposes and findings in enacting the statute bear out this holding.[15] 22 U.S.C. § 7101; Trafficking Victims Protection Act of 2000, Pub. L. 106-386, § 102 (2000). The statute was addressed to an international problem—the roughly 700,000 persons trafficked annually at the time, only 50,000 of whom were brought to the U.S. § 7101(b)(1). Congress described trafficking as a "growing transnational crime." § 7101(b)(3). It stated an intent "[t]o

---

[15] This Court considered the import of these purposes and findings for the extraterritoriality analysis in *Adhikari I. See Adhikari v. Daoud & Partners*, 994 F. Supp. 2d 831, 835–37 (S. D. Tex. 2014). On that occasion, the Court was considering whether Congress had dislodged the ordinary presumption against extraterritorial application of the statutes that it enacts. The Court looked to the purposes and findings for insight but ultimately was persuaded by other evidence that Sections 1589 and 1590, prior to the enactment of Section 1596, were not intended to apply extraterritorially. The present question is different.

deter international trafficking and bring its perpetrators to justice. § 7101(b)(24). Congress evinced concern for harms and victims around the world, not just in the U.S. *E.g.*, § 7101(b)(8) (noting "official corruption in countries of … destination, thereby threatening the rule of law" in those countries); (b)(20) (describing victims' lack of familiarity with "the laws, cultures, and languages of the countries into which they have been trafficked").

The decision of another district court, *Plaintiff A v. Schair*, 2014 WL 12495639 (N.D. Ga. Sept. 9, 2014), also lends credence to this Court's holding on Section 1590. In *Plaintiff A*, defendants based in the United States solicited American customers for fishing tours in Brazil. *Id.* at *5. Once in Brazil, the defendants' employees would coerce local women into sex acts with the defendants' customers. *Id.* at *2. Women caught in the scheme in 2005 and 2006 sued, arguing that the alleged trafficking violations entailed a domestic application of the TVPRA due to the defendants' American headquarters and customer base. *Id.* at *5. Though the court ruled that the defendants' connections to the United States were "not enough" to "change the essentially foreign nature of the case," *id.*, it suggested that conduct outside the United States might still be actionable under the statute then in effect. *Id.* at *5 n.4. "When the prohibited trafficking activity occurred entirely outside the United States, defendants must engage in more substantial domestic actions to facilitate trafficking activity than merely residing in the United States." *Id.* at *5. Plaintiffs allege just that kind of substantial domestic action here.

To be legally valid, Plaintiffs' TVPRA claims must also survive the extraterritoriality analysis of Section 1595, the statute's civil remedy. *RJR Nabisco*, 136 S. Ct. at 2106–11, marks out the proper path for this analysis. In *RJR Nabisco*, the Supreme Court held that certain substantive provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO) applied extraterritorially. *Id.* 2101–06. It also held that the statute's civil remedy, 18 U.S.C. §

1964(c), must apply extraterritorially for foreign plaintiffs suffering injury abroad to have an actionable case. *Id.* at 2106. Section 1964(c) permits "[a]ny person injured in his business or property by reason of" a substantive RICO violation to sue the violator. Looking in vain for express indications of extraterritorial reach, and citing concerns about international friction, the Supreme Court concluded that Section 1964(c) applies only to "a *domestic* injury to [a plaintiff's] business or property." 136 S. Ct. at 2106 (emphasis in original). The Supreme Court did not say how to determine "whether a particular alleged injury is 'foreign' or 'domestic.'" *Id.* at 2111.[16] Its phrasing, however, indicates that it is the location where the injury was suffered, not where it was caused, that determines its character. *Id.* ("Respondents' … claims … rest entirely on injury suffered abroad and must be dismissed."); *Id.* at 2099 ("[D]oes RICO's private right of action, contained in § 1964(c), apply to injuries that are suffered in foreign countries?").

*RJR Nabisco*'s general rule is clear: a civil remedy that lacks clear indications of extraterritorial reach will redress only injuries experienced domestically, no matter the substantive provisions' scope. Section 1595 lacks those clear indications. Thus, on question of whether KBR's alleged domestic violations of Section 1590 caused remediable domestic injuries or irremediable foreign injuries, the Court must conclude the latter. Plaintiffs' injuries, whatever their cause, were suffered only in foreign countries. They are, therefore, beyond the reach of the TVPRA that existed at that time.

The Court's regret in reaching this holding is tempered by its recognition that Congress later extended the remedies for forced labor and trafficking to apply extraterritorially. That amendment of the law might be taken as an indication of the scope that Congress always

---

[16] The plaintiffs in *RJR Nabisco* waived their claims to domestic injuries, leaving only foreign injuries. 136 S. Ct. at 2111.

intended those prohibitions to have. One can imagine canons of construction that avoided the need for Congress so to act, resolving statutory ambiguity in ways that further Congress's purposes and erring on the side of justice. But, as the Supreme Court's recent rulings instruct, those are not our canons. And so Plaintiffs' TVPRA claims must be dismissed.

### B.  Alien Tort Claims Act (ATS)

Defendants challenge Plaintiffs' ATS claim on several grounds. Defendants argue that Plaintiffs' allegations are not sufficiently tied to the United States to make this a domestic, rather than extraterritorial, application of the ATS, which does not apply extraterritorially; that the ATS is preempted by the TVPRA; that the ATS claim is time-barred; and that there is no corporate liability under the ATS. For the reasons explained below, these arguments fail. Therefore, the motion to dismiss is denied as to Plaintiffs' ATS claim.

### 1. Domestic versus extraterritorial application of the ATS

Defendants first challenge the ATS claim on the ground that the claim does not sufficiently touch and concern U.S. territory. As noted above and set forth in *Adhikari I*, courts follow a two-step framework in determining whether to apply the presumption against extraterritoriality. The first step is to determine whether the statute clearly indicates extraterritorial application. The Supreme Court found in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1669 (2013) that the ATS does not do so. Second, the court must determine whether the case involves a domestic or extraterritorial application of the statute. To do that, the court examines whether the conduct that constitutes the focus of congressional concern occurred inside or outside the United States. *RJR Nabisco*, 136 S. Ct. at 2101. If that conduct occurred

inside the United States, then the case presents a permissible domestic application of the ATS.[17] In *Adhikari I*, the Fifth Circuit held that "the ATS's focus is the 'tort…committed in violation of the law of nations or a treaty of the United States.'" 845 F.3d at 197 (citing 28 U.S.C. § 1350). The Fifth Circuit found that the human trafficking and forced labor in *Adhikari I*—the alleged violations of international law—all occurred outside the United States. *Id*. The Fifth Circuit further found that the conduct that occurred within the United States—financial transactions and U.S. personnel's awareness of allegations of human rights abuses—did not suffice to create liability under the ATS. *Id*. at 198.

This case, however, includes additional allegations that were not part of *Adhikari I*. (Doc. No. 87 at 2–4.) As detailed in the preceding section, Plaintiffs put forth a theory that KBR's domestic personnel aided and abetted the human trafficking and forced labor that occurred abroad. *Id*. Defendants do not dispute that liability for aiding and abetting is possible under the ATS. Rather, they argue that *Adhikari I* already rejected this theory. (Doc. No. 91 at 2.) Defendants note that this Court denied the *Adhikari I* plaintiffs leave to amend their complaint to add an aiding and abetting theory on grounds that amendment would be futile, and that the Fifth Circuit affirmed that denial. *See Adhikari I*, 845 F.3d at 199-200. However, this is a new case with new allegations and potentially new evidence. Therefore, the denial of leave to amend the *Adhikari I* complaint does not foreclose the possibility that the Plaintiffs here can prevail on an aiding and abetting theory.

---

[17] In *Kiobel*, the Supreme Court stated that the ATS could potentially create jurisdiction for "claims [that] touch and concern the territory of the United States…with sufficient force to displace the presumption against extraterritorial application." 133 S. Ct. at 1669. In *Adhikari I*, Plaintiffs argued that *Kiobel*'s "touch and concern" language supplants the "focus of congressional concern" inquiry described above to create an ATS-specific test. 845 F.3d 184, 193. The Fifth Circuit rejected this view and held that the focus inquiry still governs. *Id*. at 194.

In order to prove liability for aiding and abetting, a plaintiff must meet two requirements: (1) she must show that the defendant(s) provided substantial assistance (the "actus reus"), and (2) she must show that defendant(s) meet the mens rea requirement for aiding and abetting. The actus reus requirement of substantial assistance derives from international law. *See Prosecutor v. Šainović*, Case No. IT-05-87-A, Appeal J., ¶ 1649 (Jan. 23, 2014) ("practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime"); Restatement (Second) of Torts § 876(b) (1979) ("substantial assistance or encouragement to the other"). Assistance is substantial when the underlying violation "probably would not have occurred in the same way had not someone acted in the role that the [aider and abettor] in fact assumed." *Prosecutor v. Tadić*, Case No. IT-94-1-T, Trial J., ¶ 688 (May 7, 1997). Defendants contend that here, as in *Adhikari I*, the conduct that is the "focus" of the statute—human trafficking and forced labor—occurred outside the U.S. (Doc. No. 91 at 2.) However, the "focus" for *aiding and abetting* liability is the substantial assistance that Defendants provided to the trafficking scheme, much of which occurred in the United States. As already explained, Plaintiffs allege that, for several years, KBR personnel in the United States supervised and supported Daoud & Partners' operations in Iraq and coordinated KBR's responses to trafficking allegations. (Doc. No. 87 at 10-12.) As such, the alleged human trafficking and forced labor probably would not have occurred in the same way or to the same extent without KBR's actions. Plaintiffs' allegations therefore establish substantial assistance.

The second requirement for liability under the ATS for aiding and abetting is the mens rea requirement. The Fifth Circuit has not addressed the issue of what mens rea standard—purpose or knowledge—applies to aiding and abetting claims under the ATS. *Adhikari v. Kellogg, Brown & Root, Inc.*, 845 F.3d 184, 216 (5th Cir. 2017).

The Second and Fourth Circuits have adopted a purpose standard. *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009); *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 398 (4th Cir. 2011). In order to be liable for aiding and abetting under the purpose standard, a defendant must act with the purpose of advancing the underlying tort, in this case human trafficking and forced labor. *See Presbyterian Church of Sudan*, 582 F.3d at 260. In reaching this conclusion, the Second Circuit stated that, "[e]ven if there is a sufficient international consensus for imposing liability on individuals who *purposefully* aid and abet a violation of international law…, no such consensus exists for imposing liability on individuals who *knowingly* (but not purposefully) aid and abet a violation of international law." *Id.* at 259 (internal citations omitted) (emphasis in original). The Second Circuit relied in part on the Rome Statute, the statute that created the International Criminal Court (ICC), in making that statement. The Fourth Circuit followed the Second Circuit in adopting the purpose standard. *Aziz*, 658 F.3d at 398.

Some courts and legal scholars, however, advocate for a knowledge standard—that is, finding liability for aiding and abetting when an actor engaged in conduct with knowledge that she substantially assisting a violation of international law. In 2011, the D.C. Circuit adopted a knowledge standard after a lengthy review of international law. *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 32-39 (D.C. Cir. 2011). Whereas the Second Circuit relied primarily on the Rome Statute, the D.C. Circuit relied on the International Criminal Tribunal for the Former Yugoslavia (ICTY), the International Criminal Tribunal for Rwanda (ICTR), and the Nuremberg tribunals. *Id.* at 39. In 2013, however, the D.C. Circuit's judgment was vacated "in light of intervening changes in governing law regarding…the standard to be applied for aiding and abetting liability." *Doe v. Exxon Mobil Corp.*, 527 F. App'x 7 (D.C. Cir. 2013). Therefore, the status of the law on

this issue in the D.C. Circuit is not settled. The Ninth Circuit, meanwhile, acknowledged the arguments for both the knowledge standard and the purpose standard but declined to choose one, since the plaintiffs in that case had satisfied the more stringent standard. *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1023-24 (9th Cir. 2014). In addition to these nods from the D.C. Circuit and Ninth Circuit, some legal scholarship has also advocated for a knowledge standard. *See* Andrei Mamolea, *The Future of Corporate Aiding and Abetting Liability Under the Alien Tort Statute: A Roadmap*, 51 Santa Clara L. Rev. 79, 126-132 (2011) (international law scholars "vehemently denounced" the adoption of the purpose standard by the Second Circuit); James Morrissey, *Presbyterian Church of Sudan v. Talisman Energy, Inc.: Aiding and Abetting Liability Under the Alien Tort Statute*, 20 Minn. J. Int'l L. 144 (2011).

This Court holds, based on various sources of international law, that the proper mens rea standard for aiding and abetting liability under the ATS is knowledge. The Court notes that the knowledge standard has been applied by the ICTY, ICTR, and Nuremberg tribunals. *See Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 39 (D.C. Cir. 2011); Mamolea, *supra* at 131 ("The ad hoc tribunals established for Rwanda and the Former Yugoslavia during the 1990s have consistently applied the Nuremberg knowledge standard"); Morrissey, *supra* at 158 ("the standard established in the cases prosecuting German war criminals at Nuremburg clearly establish, in aggregate, that liability for war crimes and genocide can result from 'knowingly providing substantial assistance in the commission of these crimes'"); *see also, e.g.*, *Prosecutor v. Vasilijevic*, Case No. IT-98-32-T P 71 (Nov. 29, 2002) (the "aider and abettor must be aware of the essential elements of the crime" but "need not share the intent of the principal offender"). These tribunals are entitled to significant deference because they are only empowered to apply standards that are indisputably part of customary international law. Morrissey, *supra* at 163.

The Court also finds support for the knowledge standard in the Rome Statute. Article 30, which sets forth mens rea requirements for crimes within the jurisdiction of the ICC, provides that "a person shall be criminally responsible and liable for punishment…only if the material elements are committed with intent and knowledge." Importantly, however, intent is defined to mean that the person "means to engage in the conduct" and "means to cause that consequence *or is aware that it will occur* in the ordinary course of events." Rome Stat. art. 30 (emphasis added). Thus, although the Rome Statute uses the word "intent," the mens rea standard it articulates is knowledge.[18]

Plaintiffs have sufficiently alleged that Defendants knowingly aided and abetted human trafficking and forced labor:

> KBR knew that Daoud and other labor brokers were involved in human trafficking while recruiting, harboring, transporting, providing, receiving, and obtaining workers for KBR's contracts for the U.S. military, yet despite that knowledge, purposefully continued to collaborate with, contract with and use Daoud and the other labor brokers for years knowing the conduct would continue, benefitting from it, [and] taking no genuine steps to prevent or stop human trafficking or punish those responsible….

(Doc. No. 1 ¶ 128.) Therefore, the Court declines to dismiss Plaintiffs' ATS claim as an extraterritorial application of the statute.[19]

---

[18] Further support for this interpretation comes from *Prosecutor v. Vasilijevic*, Case No. IT-98-32-T P 71 (Nov. 29, 2002), an ICTY decision issued after the adoption of the Rome Statute, which applied a knowledge standard.

[19] Because the Court finds that Plaintiffs have sufficiently pled a domestic application of the ATS through their aiding and abetting allegations, there is no need to assess Plaintiffs' arguments based on the superior responsibility doctrine. *See, e.g.*, Rome Statute art. 28(b); *Doe v. Drummond Co., Inc.*, 782 F.3d 576, 609 (11th Cir. 2015); *Chavez v. Carranza*, 559 F.3d 486, 499 (6th Cir. 2009). Therefore, the Court makes no findings as to superior responsibility at this time.

## 2. Preemption by the TVPRA

Defendants argue that the TVPRA preempts ATS claims for trafficking and forced labor. (Doc. No. 83 at 11-14.) This Court rejected that argument when it was raised in *Adhikari I*.[20] *See Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674, 687-88 (S.D. Tex. 2009). As in *Adhikari I*, the Court here declines to dismiss Plaintiffs' ATS claim on the basis of TVPRA preemption.

## 3. Statute of limitations

Defendants argue that Plaintiffs' ATS claim is time-barred, based on Texas's two-year statute of limitations for personal injury claims. (Doc. No. 83 at 15-16). The ATS does not specify a statute of limitations, and the Fifth Circuit has not ruled on what statute of limitations should apply. *See Ellul v. Congregation of Christian Bros*., 774 F.3d 791, 798–99 (2d Cir. 2014). Four other circuit courts, however, have ruled that the ATS has a 10-year statute of limitations based on the Torture Victim Protection Act. *See Chavez v. Carranza*, 559 F.3d 486, 492 (6th Cir. 2009); *Jean v. Dorelien,* 431 F.3d 776, 778–79 (11th Cir. 2005); *Van Tu v. Koster,* 364 F.3d 1196, 1199 (10th Cir. 2004); *Papa v. United States*, 281 F.3d 1004, 1012 (9th Cir. 2002). Defendants argue that, rather than following those courts, this Court should look to the most closely analogous state law. (Doc. No. 83 at 15-16.) Defendants' argument is based on *North Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995). In that case, the Supreme Court held that, where a federal statute fails to provide a statute of limitations, state law should govern. *North Star*, 515 U.S. at 34. *North Star* makes an exception only in rare cases in which the state limitations period would frustrate or interfere with the implementation of national policies or be

---

[20] The Fifth Circuit affirmed this Court's decision in *Adhikari I*, though it did not specifically address the TVPRA preemption issue. *Adhikari I*, 845 F.3d 184 (5th Cir. 2017)

at odds with the purpose or operation of federal substantive law. *Id.* at 34-35. Under those circumstances, the court should look to an analogous federal law. *Id.*

The Court finds that the application of a two-year statute of limitations would be at odds with the purpose and implementation of the ATS, which is designed to enforce the law of nations and treaties of the United States. As such, this Court follows the Sixth, Ninth, Tenth, and Eleventh Circuits in applying a 10-year statute of limitations to the ATS. Plaintiffs' claims accrued in 2007, and this case was filed in 2015. Therefore, Plaintiffs' ATS claims are not time-barred.

### 4. Corporate liability

Finally, Defendants argue that corporations cannot be liable under the ATS.[21] (Doc. No. 83 at 17.) The Seventh, Ninth, Eleventh, and D.C. Circuits have all held that corporations can be liable under the ATS. *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1022 (9th Cir. 2014); *Flomo v. Firestone Nat'l Rubber Co., LLC*, 643 F. 3d 1013, 1017-21 (7th Cir. 2011); *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 57 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013); *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1315 (11th Cir. 2008). The Second Circuit is the only circuit court that has held differently. *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010). This Court follows the Seventh, Ninth, Eleventh, and D.C. Circuits in holding that corporations can be liable under the ATS.

---

[21] The *Adhikari I* Defendants presented this argument to the Fifth Circuit. *See* Doc. No. 87 at 22 n. 3. The Fifth Circuit, however, dismissed the ATS claim on other grounds. 845 F.3d at 195-99.

## C. Equitable tolling on Plaintiffs' state law claims

The parties disagree about the relevant statute of limitations for Plaintiffs' state law claims of false imprisonment, negligence, negligent hiring, negligent supervision, and intentional infliction of emotional distress. (Doc. No. 83 at 13; Doc. No. 87 at 27). Defendants argue that the relevant statute of limitations is two years because all the state law claims are personal injury claims. *See* Tex. Civ. Prac. & Rem. Code § 16.003(a). Plaintiffs argue that a five-year statute of limitations applies to personal injury claims related to human trafficking. (Doc. No. 87 at 27.) However, Plaintiffs' claims would be untimely even under a five-year statute of limitations, since the claims accrued in 2007 and the lawsuit was not filed until 2015. Therefore, Plaintiffs' claims only survive if equitable tolling applies.

Plaintiffs' Complaint states that they were prevented from filing a lawsuit earlier because they are citizens of Nepal, "one of the least developed countries in the world," and they were unable to bring their claims in Nepal because of lack of jurisdiction over Defendants. (Doc. No. 1 ¶ 88.) This Court rejected these arguments in *Adhikari I*, and the Fifth Circuit affirmed: "[g]eographic location and personal hardship cannot provide the sole basis for tolling an otherwise applicable statute of limitations." 845 F.3d at 207. Moreover, courts apply equitable tolling "principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." *Id.* (quoting *United States v. Patterson*, 211 F.3d 927, 930 (5th Cir. 2000)). There are no such allegations here. However, courts have held that "because the question whether a particular party is eligible for equitable tolling generally requires consideration of evidence beyond the pleadings, such tolling is not generally amenable to resolution on a Rule 12(b)(6) motion." *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 301–02 (3d Cir. 2010); *see also Huynh v. Chase Manhattan Bank,* 465

F.3d 992, 1003–04 (9th Cir. 2006) ("Generally, the applicability of equitable tolling depends on matters outside the pleadings, so it is rarely appropriate to grant a Rule 12(b)(6) motion to dismiss (where review is limited to the complaint) if equitable tolling is at issue."); *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004) (rejecting defendant's argument that plaintiffs' claims were untimely and noting that "because the period of limitations is an affirmative defense it is rarely a good reason to dismiss under Rule 12(b)(6)").

Given that equitable tolling is an issue that requires the consideration of evidence beyond the pleadings, the Court declines to dismiss Plaintiffs' state law claims at the Rule 12(b)(6) stage on the basis of the statute of limitations.

### D. Negligence, negligent hiring, and negligent supervision claims

Defendants argue that Plaintiffs have failed to allege a cognizable duty with regard to their negligence, negligent hiring, and negligent supervision claims. For the reasons explained below, the Court denies the motion to dismiss as to these claims.

### 1. Negligence

"As a general rule, a person has no legal duty to protect another from the criminal acts of a third person…. However, if a criminal's conduct is a foreseeable result of the prior negligence of a party, the criminal act may not excuse that party's liability." *Barton v. Whataburger, Inc.*, 276 S.W.3d 456, 462 (Tex. App. 2008) (internal quotations and citations omitted.). Plaintiffs argue that Defendants had a duty to protect them from reasonably foreseeable criminal conduct of third parties. (Doc. No. 87 at 29.) They further argue that Defendants knew that Daoud was a

"dangerous agent." *Id*. Therefore, according to Plaintiffs, Defendants owed a duty of reasonable care to protect Plaintiffs from the criminal actions of Daoud. *Id*.

Defendants counter that Plaintiffs have alleged no facts to show that U.S.-based managers knew that Daoud posed a foreseeable danger to Plaintiffs. (Doc. No. 91 at 9.) However, the Complaint alleges that, prior to the trafficking of these Plaintiffs, Defendants knew that trafficking was going on, and that Daoud was engaged in deceptive practices. (Doc. No. 1 ¶¶ 95-96.) Therefore, Plaintiffs have adequately pled the duty element of their negligence claim.

Defendants also cite this Court's March 2015 summary judgment decision in *Adhikari I*, in which the Court found that "[n]one of [the *Adhikari I* plaintiffs' evidence] indicates…that KBR's U.S.-based employees understood the circumstances surrounding Daoud's 'recruitment' and 'supply' of third-country nationals like Plaintiffs, or that KBR's U.S.-based employees worked to prevent those circumstances from coming to light or Daoud's practices from being discontinued." *Adhikari v. Daoud & Partners*, 95 F. Supp. 3d 1013, 1020 (S.D. Tex. 2015). That ruling, however, does not have any preclusive effect here. First, because Plaintiffs are pursuing an aiding and abetting theory which was not pursued in *Adhikari I*, it is at least possible there will be evidence produced here that did not come up in the earlier litigation. Second, although collateral estoppel does not require complete identity of the parties, "the party against whom the collateral estoppel would be applied generally must either have been a party, or privy to a party, in the prior litigation." *Vines v. Univ. of La. at Monroe*, 398 F.3d 700, 705 (5th Cir. 2005) (citing *Terrell v. DeConna*, 877 F.2d 1267, 1270 (5th Cir. 1989)). Here, the Plaintiffs were not parties to *Adhikari I*, and Defendants have not established that the Plaintiffs are in privity with the *Adhikari I* plaintiffs.

## 2. Negligent hiring and negligent supervision

Defendants suggest that KBR's independent contractor relationship with Daoud & Partners does not give rise to a duty to Plaintiffs. (Doc. No. 91 at 8.) Texas law, however, "allows recovery for negligent hiring, training, and supervision where an employer knew or should have known through the exercise of reasonable care that an employee was incompetent or unfit and that his hiring or retention would thereby create an unreasonable risk of harm to others." *Verhelst v. Michael D's Restaurant San Antonio, Inc.*, 154 F. Supp. 2d 959, 967 (W.D. Tex. 2001). These causes of action extend to independent contractor relationships. *Mireles v. Ashley*, 201 S.W.3d 779, 782 (Tex. App. 2006); *Castro v. Serrata*, 145 F. Supp. 2d 829, 831 (S.D. Tex. 2000). The elements for negligent hiring for an independent contractor relationship are: (1) the employer knew or should have known that the contractor was incompetent, and (2) a third person was injured because of the contractor's incompetence. *Mireles*, 201 S.W.3d at 782. For a negligent supervision claim, the plaintiff must establish that: (1) the defendant exercised some control over the contractor's work; (2) the defendant did not exercise reasonable care in supervising the contractor's activities; and (3) the plaintiff's injuries were proximately caused by the contractor's negligence. *Castro*, 145 F. Supp. 2d at 831. Plaintiffs have satisfactorily pled these elements. As such, Plaintiffs have sufficiently pled their claims for negligent hiring and negligent supervision.

## E. Intentional infliction of emotional distress

To recover for intentional infliction of emotional distress (IIED), a plaintiff must show that: (1) the defendant acted intentionally or recklessly; (2) the conduct was "extreme and outrageous"; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the

resulting emotional distress was severe. *Standard Fruit and Vegetable Co., Inc. v. Johnson*, 985 S.W.2d 62, 65 (Tex. 1998). The Texas Supreme Court has held that IIED is a "gap-filler" tort intended to provide a cause of action for egregious conduct that might otherwise go unremedied. *Hoffman-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004). Therefore, this remedy is not available when the defendant intended to invade some other legally protected interest, even if emotional distress results. *Standard Fruit and Vegetable Co., Inc.*, 985 S.W.2d 62 at 67.

Here, Plaintiffs cannot reasonably argue that Defendants acted with the primary intent to cause emotional distress to Plaintiffs. Furthermore, the emotional distress the Plaintiffs experienced unquestionably arose from the invasion of other legal rights. Therefore, Plaintiffs' IIED claim should be dismissed.

### F. Iraq law claims

#### 1. Equitable tolling

Defendants argue that Plaintiffs' claims under Iraq law are time-barred because they are subject to a three-year statute of limitations. (Doc. No. 83 at 19-20.) Plaintiffs respond that Iraq law provides for equitable tolling up to 15 years. (Doc. No. 87 at 24.) As explained above, a Rule 12(b)(6) motion is typically inappropriate to resolve the issue of equitable tolling where Plaintiffs raise a fact issue. Therefore, the Court declines to dismiss the Iraq law claims.

#### 2. Coalition Provisional Authority Order 17

The Coalition Provisional Authority (CPA) was established in 2003 as a transitional government in Iraq after the fall of Saddam Hussein. *McGee v. Arkel Int'l, LLC*, 671 F.3d 539, 542 (5th Cir. 2012). It was dissolved on June 30, 2004. *Id.* The day before the CPA dissolved, it

signed into law Order 17, which relates to contractors working in Iraq for the United States Department of Defense. *Id*. at 543. Order 17 provides that "Contractors shall not be subject to Iraqi laws or regulations in matters relating to the terms and conditions of their Contracts." *Id*. It further provides that "Contractors shall be immune from Iraqi legal process with respect to acts performed by them pursuant to the terms and conditions of a Contract or any sub-contract thereto." *Id*. Neither of these provisions bars the instant lawsuit. First, this case does not concern the terms and conditions of Defendants' contracts with the Department of Defense. Second, the Fifth Circuit has held that, "[a]lthough CPA Order 17 provides contractors immunity from Iraqi laws relating to their contractual 'terms and conditions' and from Iraqi legal process, it does not create an immunity from Iraqi laws relating to tort claims brought in federal court in the United States." *McGee*, 671 F.3d at 544. Therefore, the Court declines to dismiss as to Plaintiffs' Iraq law claims on this basis.

### G. Injunctive relief

Plaintiffs seek "equitable relief, permanently enjoining Defendants from further engaging in abuses against Plaintiffs and their fellow laborers." (Doc. No. 1 at 55.) Defendants argue that there is no case or controversy that would justify injunctive relief. (Doc. No. 83 at 21-22.) Defendants point to *City of Los Angeles v. Lyons*, 461 U.S. 95, 95-96 (1983), which held that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." Defendants note that Plaintiffs do not allege that they will again experience injury as a result of the activity they seek to enjoin. (Doc. No. 83 at 22.) As such, Plaintiffs are not entitled to injunctive relief.

**IV.    CONCLUSION**

For the reasons set forth above, Defendants' Motion to Dismiss is **GRANTED** as to the TVPRA and intentional infliction of emotional distress claims, as well as Plaintiffs' request for injunctive relief. The Motion to Dismiss is otherwise **DENIED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 25th day of September, 2017.

_____
HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE